# 13-769

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

**Appellee**

v.

**WILLIAM A. TRUDEAU, JR.,**

**Defendant-Appellant.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**BRIEF FOR DEFENDANT-APPELLANT
WILLIAM TRUDEAU**

Ross H. Garber
Paul S. Bailin
Michael Chase
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
Tel: (860) 251-5011
Fax: (860) 251-5319
Email: pbailin@goodwin.com

and

James K. Filan
Filan LLC
315 Post Road West
Westport, CT 06880
Tel: (203) 557-9159
Fax: (203) 341-8560
Email: jfilan@jamesfilan.com

August 9, 2013                                                  Counsel for Defendant-Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................ i

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT........................................................1

ISSUES PRESENTED FOR REVIEW....................................................1

STATEMENT OF THE CASE ................................................................2

PRELIMINARY STATEMENT ............................................................2

STATEMENT OF FACTS.......................................................................5

The Indictment Portrays Mr. Trudeau as the Leader and Active
Participant in a Mortgage Fraud Scheme.............................................5

The Government Tries To Persuade the Jury that Mr. Trudeau
Participated in and Actively Managed Every Aspect of the Mortgage
Fraud Scheme .......................................................................................7

The Jury Is Instructed on Aiding and Abetting and Conspiracy.....................11

The Jury Finds Mr. Trudeau Not Guilty on Counts 2 - 8, Which Also
Comprise the Objects of the Alleged Conspiracy Charged in Count 1 ...........12

The District Court Finds That Notwithstanding the Jury's Verdict,
Mr. Trudeau Committed All of the Charged Offenses and Sentences
Him as if He Were So Convicted ....................................................... 12

SUMMARY OF THE ARGUMENT.................................................... 16

STANDARD OF REVIEW AND PRESERVATION.......................... 18

ARGUMENT ........................................................................................ 19

I.   BY REJECTING THE JURY'S DETERMINATION OF THE
     OBJECT OF THE MULTI-OBJECT CONSPIRACY CHARGED
     IN COUNT ONE, THE COURT ERRED IN ITS APPLICATION
     OF THE SENTENCING GUIDELINES.................................... 19

II.  TO THE EXTENT THE JURY ISSUED A GENERAL VERDICT ON
     THE COUNT ONE MULTI-OBJECT CONSPIRACY, THE COURT'S
     JUDICIAL FACT-FINDING PURSUANT TO THE SENTENCING
     GUIDELINES VIOLATED MR. TRUDEAU'S SIXTH
     AMENDMENT RIGHTS ........................................................ 26

III. TO THE EXTENT THE COURT PROPERLY APPLIED THE
     SENTENCING GUIDELINES FOR MULTI-OBJECT
     CONSPIRACIES, SUCH APPLICATION VIOLATED MR.
     TRUDEAU'S FIFTH AMENDEMENT RIGHTS ................................. 32

IV.  MR. TRUDEAU'S SENTENCE WAS UNCONSTITUTIONALLY
     DISPROPORTIONATE TO HIS OFFENSE OF CONVICTION ....... 37

V.   THE SIXTH AMENDMENT BARS ANY SENTENCING
     ENHANCEMENTS BASED ON ACQUITTED CONDUCT ................. 43

     A.   *Watts* Is No Longer Good Law ......................................... 43

     B.   Acquitted Conduct Sentencing Undermines the Rights to a
          Trial by Jury and Due Process of Law, and Violates the
          Sentencing Reform Act ........................................................ 47

VI.  REMEDY ...................................................................................... 52

     A.   Scope of Remand .................................................................. 52

     B.   Remand to a Different Judge ............................................... 54

CONCLUSION   ....................................................................................... 56

CERTIFICATE OF COMPLIANCE.......................................................... 58

SPECIAL APPENDIX................................................................................ 59

     CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES........ 59

U.S. Const. Art. III, § 2, cl. 3 ................................................ 59

U.S. Const. Amend. V ........................................................... 59

U.S. Const. Amend. VI .......................................................... 59

18 U.S.C.A. § 3553 ............................................................... 59

**2012 U.S. Sentencing Commission Federal Sentencing Guidelines ....... 61**

§1B1.1. Application Instructions ........................................ 61

§1B1.1 App. Note 5 ............................................................ 61

§1B1.2. Applicable Guidelines ............................................ 62

§1B1.2. App. Notes ............................................................ 62

§1B1.3. Relevant Conduct ................................................... 63

§1B1.3 App. Note 2 ............................................................ 64

§2B1.1 (Fraud) .................................................................. 67

§3A1.1. Hate Crime Motivation or Vulnerable Victim ............... 68

§3B1.1. Aggravating Role .................................................. 68

§3D1.1. Procedure for Determining Offense Level on
Multiple Counts ............................................................... 68

§3D1.2. Groups of Closely Related Counts ........................... 68

§5A. Sentencing Table ....................................................... 71

**Judgment in a Criminal Case ........................................... 72**

**Judgment of Acquittal ................................................... 76**

# TABLE OF AUTHORITIES

## FEDERAL CONSTITUTION AND STATUTES

U.S. Const. Art. III, § 2, cl. 3 ................................................................ 47

U.S. Const. Amend. 5 ................................................................. passim

U.S. Const. Amend. 6 ................................................................. passim

18 U.S.C. § 1341 ................................................................................. 2

18 U.S.C. § 1343 ................................................................................. 2

18 U.S.C. § 1344 ................................................................................. 2

18 U.S.C. § 1349 ................................................................................. 2

18 U.S.C. § 3231 ................................................................................. 1

18 U.S.C. § 3553(a) ...................................................................... 37, 56

28 U.S.C. § 1291 ................................................................................. 1

U.S. Sentencing Commission Federal Sentencing Guidelines (2012) ........... passim

## CASES

*Alleyne v. United States*, 133 S. Ct. 2151 (2013) .............................. passim

*Apprendi v. New Jersey,* 530 U.S. 466 (2002) .................................... 18, 30

*Blakely v. Washington*, 542 U.S. 296 (2004) ............................... 30, 38, 48

*Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999) ......................... 55-56

*Cunningham v. California*, 549 U.S. 270 (2007) ................................... 30

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837
(2d Cir. 1998) ................................................................................. 24

*Edwards v. United States*, 523 U.S. 511 (1998) ..................................................... 29

*Griffin v. United States*, 502 U.S. 46 (1991) ....................................................... 28-29

*Harris v. United States*, 536 U.S. 545 (2002) ......................................................... 30

*Jones v. United States*, 526 U.S. 227 (1998) ................................................... 29, 47-48

*Lewis v. United States*, 518 U.S. 322 (1996) ......................................................... 32

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986) ................................................ passim

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................................... 30

*United States v. Ayala*, 75 F. Supp. 2d 126 (S.D.N.Y. 1999) ............................... 39

*United States v. Barnes*, 158 F.3d 662 (2d Cir. 1998) ...................................... 28-29

*United States v. Bliss*, 09-cr-00224 (JCH) (D. Conn. Feb. 15, 2013) ...................... 8

*United States v. Booker*, 543 U.S. 220 (2005) ........................................... 30, 33, 45

*United States v. Bradley*, 644 F.3d 1213 (2012) ............................................. passim

*United States v. Bryk*, 11-cr-62 (JCH) (D. Conn. March 16, 2013) ......................... 8

*United States v. Bush*, 70 F.3d 557 (10th Cir. 1995) ............................................. 27

*United States v. Carania,* 532 F.3d 764 (8th Cir. 2007) .................................. 44, 50

*United States v. Carpenter*, 287 F. App'x 131 (2d Cir. 2008) .............................. 19

*United States v. Coleman*, 370 F. Supp. 2d 661 (S.D. Ohio 2005) ...................... 49

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) ............................. 49-50

*United States v. Delia*, 749 F. Supp. 500 (S.D.N.Y. 1990) .................................. 24

*United States v. Drayer*, 364 F. App'x 716 (2d Cir. 2010) .................................. 18

v

*United States v. Faust*, 456 F.3d 1342 (11th Cir. 2006) .............................. 45, 51-52

*United States v. Fisher*, 502 F.3d 293 (3d Cir. 2007) ............................................. 42

*United States v. Frias*, 39 F.3d 391 (2d Cir. 1994)................................................. 49

*United States v. Gaudin*, 515 U.S. 506 (1995)........................................................ 47

*United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996) .................................. 38-40, 43

*United States v. Grier*, 449 F.3d 558 (3d Cir. 2006) ............................................. 41

*United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) ............................44-45, 50-51

*United States v. Hawkins*, 547 F.3d 66 (2d Cir. 2008) .......................................... 25

*United States v. Hudson*, 972 F.2d 504 (2d Cir. 1992)........................................... 18

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ............................................. 39

*United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990) ..................................... 41

*United States v. Kramer*, 289 F.2d 909 (2d Cir. 1961).................................... 53-54

*United States v. Kriz*, 08-cr-171 (JCH) (D. Conn. June 7, 2013) ..............................8

*United States v. Lombard*, 102 F.3d 1 (1st Cir. 1996)............................................ 49

*United States v. Macklin*, 927 F.2d 1272 (2d Cir. 1991) ................................. 26, 31

*United States v. Malpeso*, 115 F.3d 155 (2d Cir. 1997) .................................... 27-28

*United States v. Mercado*, 474 F.3d 654 (9th Cir. 2007)................................. 45, 50

*United States v. Mespoulede*, 597 F.2d 329 (2d Cir.1979)..................................... 54

*United States v. Mullins*, 971 F.2d 1138 (4th Cir.1992)......................................... 34

*United States v. Norris*, 281 F.3d 357 (2d Cir. 2002)............................................ 39

*United States v. O'Brien*, 130 S. Ct. 2169 (2010) ................................................ 30, 42

*United States v. Orozco-Prada*, 732 F.2d 1076 (2d Cir. 1984) ................. 20, 21, 27

*United States v. Outen*, 286 F.3d 622 (2d Cir. 2002) ......................................... 39

*United States v. Peters*, 617 F.2d 503 (7th Cir. 1980) ........................................ 21

*United States v. Pica*, 692 F.3d 79 (2d Cir. 2012) .............................................. 43

*United States v. Preston*, 09-cr-223 (JCH) (D. Conn. March 16, 2013) ................. 8

*United States v. Regan*, 946 F.2d 188 (2d Cir. 1991) .......................................... 21

*United States v. Reuter,* 463 F.3d 792 (7th Cir. 2006) ......................................... 49

*United States v. Reyes*, 691 F.3d 453 (2d Cir. 2012) ........................................... 19

*United States v. Robin*, 553 F.2d 8 (2d Cir. 1977) ............................................... 55

*United States v. Robles*, 562 F.3d 451 (2d Cir. 2009) .......................................... 28

*United States v. Scotti*, 47 F.3d 1237 (2d Cir. 1995) ........................................... 21

*United States v. Shonubi*, 103 F.3d 1085 (2d Cir. 1997) ...................................... 39

*United States v. Staten*, 466 F.3d 708 (9th Cir. 2006) ..................................... 38-40

*United States v. Stevens*, 08-cr-250 (JCH) (D. Conn. April 17, 2013) ................... 8

*United States v. Townley*, 929 F.2d 365 (8th Cir. 1991) ....................................... 42

*United States v. Watts*, 519 U.S. 148 (1997) ............................................... passim

*United States v. White*, 551 F.3d 381 (6th Cir. 2008) ........................................... 44

*United States v. Zillgitt*, 286 F.3d 128 (2d Cir. 2002) .......................................... 27

## __OTHER AUTHORITIES__

Bryan Garner, Black's Law Dictionary, 2d. Pocket Ed., 231 (2001) ............... 46-47

Mark Hansen, Acquitting Time After *Apprendi*, New Challenges to Sentencing
Enhancements Emerge, ABA J. 18 (August 2008) ................................................. 51

Matthew MacKinnon Shors, *United States v. Watts*: Unanswered Questions,
Acquittal Enhancements, and the Future of Due Process and the American
Criminal Jury, 50 Stan. L. Rev. 1349 (1998) ......................................................... 51

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this matter under 18 U.S.C. § 3231. A final judgment of conviction was entered on February 15, 2013. Defendant filed a timely notice of appeal on February 25, 2013 pursuant to Fed. R. App. P. 4. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court exceeded its authority under the Federal Sentencing Guidelines by finding objects of conspiracy that the jury had rejected.

2.     Whether a district court's determination of objects of a conspiracy by relying on acquitted conduct violates the Sixth Amendment jury right.

3.     Whether the Sentencing Guidelines' arbitrary use of a different standard of proof for conspiracies to commit crimes with fungible and non-fungible harms violates the Due Process Clause of the Fifth Amendment.

4.     Whether Mr. Trudeau's Fifth Amendment due process rights were violated when the court relied on acquitted conduct found by a preponderance of the evidence in sentencing Mr. Trudeau to a term of incarceration more than 20 times longer than what the jury's verdict would support.

5.     Whether acquitted conduct sentencing is impermissible, particularly in light of *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

1

## STATEMENT OF THE CASE

This is an appeal from a judgment of the United States District Court for the District of Connecticut (Hall, J.) rendered February 15, 2013, after trial by jury. Mr. Trudeau was charged with one count of conspiracy (18 U.S.C. § 1349); two counts of bank fraud (18 U.S.C. § 1344); three counts of mail fraud (18 U.S.C. § 1341); and three counts of wire fraud (18 U.S.C. § 1343). The jury convicted Mr. Trudeau of conspiracy and of one count of wire fraud, but acquitted him of all other charges. Based on finding by a preponderance of the evidence that Mr. Trudeau committed the conduct of which he was acquitted, Judge Hall sentenced Mr. Trudeau to 188 months imprisonment and five years supervised release, and ordered him to provide restitution of $4.26 million. (Judgment (Appendix ("A_") at A278).) Mr. Trudeau challenges that sentence on appeal.

## PRELIMINARY STATEMENT

This case presents the question whether a district court may manifest its disagreement with a jury verdict in a criminal case by finding, on a preponderance of the evidence, that the defendant committed crimes of which he was acquitted, thereby sentencing the defendant to nearly 16 years in prison, when the Federal Sentencing Guidelines for the actual counts of conviction provided for a sentence of 8 - 14 *months*.

2

The defendant, William Trudeau is a builder and developer of high-end homes in southwestern Connecticut. By Indictment in November 2010, the government alleged that from 2001 through February 2008, Mr. Trudeau engaged in and led a broad scheme to defraud banks and mortgage lenders of millions of dollars by submitting false loan documents relating to a half dozen such homes (Counts 2 - 8). The government also alleged that, during a brief period of a few weeks in the spring of 2010, Mr. Trudeau and his wife Heather Bliss committed wire fraud by misleading a friend into loaning them $50,000, funds they repaid in full with interest (Count 9). Finally, the government alleged that Mr. Trudeau engaged in a multi-object conspiracy to commit those same crimes charged in Counts 2 through 9 (Count 1).

A jury convicted Mr. Trudeau of the wire fraud in Count 9, but acquitted him of all of the various mortgage fraud offenses in Counts 2 - 8. The jury also returned a verdict of guilty on the multi-object conspiracy charge in Count 1. Nevertheless, at sentencing, the district judge found – by a mere preponderance of the evidence – that Mr. Trudeau had in fact committed all of the offenses of which the jury acquitted him. Based on those findings, the judge sentenced him at offense level 33, a full 26 levels higher than if he had only conspired to commit and committed the single offense of wire fraud. As a result, Mr. Trudeau is currently serving a 188-month sentence.

The district court indicated during Mr. Trudeau's sentencing hearing that it interposed its own fact-finding in place of the jury's and that such an approach – in which the court found facts by a preponderance of the evidence – was sanctioned by the Sentencing Guidelines and by this Court. For the reasons described below, the court erroneously applied the Sentencing Guidelines, which do not permit a court to disregard a jury's determination of the objects of a multi-object conspiracy where those objects can be discerned from the circumstances. In any event, even if the jury's verdict was ambiguous as to the object(s) of the conspiracy – which it was not – the Sentencing Guidelines cannot properly permit the court to determine the objects of the conspiracy by a preponderance of the evidence without running afoul of both the Fifth and Sixth Amendments to the Constitution. The court's expansive approach to using acquitted conduct at sentencing also runs afoul of constitutional protections, to the extent the use of acquitted conduct is permitted at all. Particularly in the case of acquitted conduct that determines the objects of a conspiracy – which effectively determine the counts of conviction – the use of acquitted conduct is impermissible under the Sixth Amendment. The Fifth Amendment also precludes such fact finding where it is accomplished, as here, by using a preponderance of the evidence standard. Moreover, by displacing the jury's factual determinations with its own, the district court imposed a sentence unconstitutionally disproportionate to Mr. Trudeau's actual offense of conviction.

Finally, the case reflects the mischief that can result from some of this Court's acquitted conduct jurisprudence and presents an opportunity for the Court to revisit the continued viability of those cases, particularly in light of more recent Supreme Court authority.

Put simply, while a district judge is entitled to disagree with a jury's decision, he or she cannot disregard it and sentence a defendant as if the verdict had been as the judge wished.

## STATEMENT OF FACTS

### The Indictment Portrays Mr. Trudeau as the Leader and Active Participant in a Mortgage Fraud Scheme

The Indictment in this case charged Mr. Trudeau with one count of conspiracy, two counts of bank fraud, three counts of mail fraud, and three counts of wire fraud. (Indictment (A26).) Specifically, the Indictment alleged that Mr. Trudeau worked with his wife Heather and with various real estate lawyers, mortgage brokers, and appraisers between 2001 and 2008 to defraud federally insured financial institutions and mortgage lenders of more than $2,000,000. (*Id.* at ¶¶ 3-11, 35 (A26-29, A38).) The Indictment further alleged that Mr. Trudeau both directed the alleged scheme (*id.* at ¶¶ 19, 21-22 (A31-32)) and engaged in numerous overt acts in its furtherance. The latter allegedly included forming shell corporations (*id.* at ¶¶ 14-15 (A30)), issuing checks on behalf of those corporations (*id.*), directing the placement of funds into those accounts in order to mislead

mortgage lenders (*id.* at ¶ 16 (A30-31)), submitting and causing the submission of false mortgage applications (*id.* at ¶¶ 19, 37 (A31, A39)), directing the improper purchase of properties (*id.* at ¶ 21 (A32)), fraudulently obtaining financing (*id.* at ¶¶ 30, 31b-c (A35-36)), causing various fraudulent mailings to be delivered (*id.* at ¶ 40 (A40)), and causing various fraudulent wire transmissions (*id.*).

The Indictment also alleged, in Count 9, that in 2010, several years after the other activities charged in the Indictment ended, Mr. Trudeau improperly obtained a short-term, $50,000 loan from a private individual (whom the government later identified as James Agah, a family friend of Mr. Trudeau), and that Mr. Trudeau used the proceeds for his family's personal and legal expenses rather than for the intended construction purposes. The government charged Mr. Trudeau with wire fraud in conjunction with this loan based on (1) a single telephone call and e-mail exchange misrepresenting that he had a signed purchase contract from a buyer and needed the funds to finish construction on a home; and (2) the fact that that Mr. Trudeau and Ms. Bliss later provided Mr. Agah a blanket mortgage over various properties they knew to be in foreclosure. (*Id.* at ¶¶ 34a-f (A37-38).) The fraud was alleged to have taken place over a 19-day period, beginning on March 27, 2010, and ending on April 15 of that same year. (*Id.*) The Indictment did not charge that any of the various real estate lawyers, mortgage brokers, or appraisers

allegedly involved in the Count 2 - 8 bank and mortgage frauds in participated in

any way in the Count 9 offense. Just Mr. Trudeau and his wife Heather.

### The Government Tries To Persuade the Jury that Mr. Trudeau Participated in and Actively Managed Every Aspect of the Mortgage Fraud Scheme

At trial, consistent with the Indictment, the government tried to prove that

Mr. Trudeau had been both the ringleader of and an active participant in the

scheme to defraud banks and mortgage lending institutions out of millions of

dollars through the submission of false loan documents. (Closing Arg. at 2-4, 13-

32 (A155, A158-62).) Other alleged members of the scheme were presented as

merely *helping* Mr. Trudeau to "lie, cheat and steal." (*Id.* at 7, 9 (A156-57).) The

government expressly told the jury that each participant discussed his specific

crimes with Mr. Trudeau. (*Id.*) And, after rhetorically asking the jury "How did

Bill Trudeau's scheme and conspiracy work?," the government proceeded to list

numerous specific "overt acts" that Mr. Trudeau allegedly performed or

"orchestrated" in the furtherance of both the conspiracy and the substantive crimes

charged in Counts 2 - 9. (*Id.* at 13-34 (A158-63).) There was never any

suggestion by the government that Mr. Trudeau was a minor or passive member of

the alleged mortgage fraud scheme. Rather, the government's theory of the case

was always that Mr. Trudeau was "at the center," the one "driving the bus," and

that his handwriting was, quite literally, all over the crimes that the conspiracy was

alleged to have committed. (*Id.* at 14, 18, 30-33, 65 (A158-59, A162-63, A171).)

Much of this evidence came from what the government itself referred to as a "criminal crew" of "slimy people." (*Id.* at 4, 31, 36 (A155, A162-63).) The Crew included Fred Stevens, a licensed mortgage broker who would lie to banks "if the money was right"; Tom Preston, a "corrupt appraiser"; Joseph Kriz, a "crooked lawyer" who had long been stealing from his clients' IOLTA trust accounts to fund his gambling propensities; and John Bryk, another lawyer "willing to bend the rules." (*Id.* at 4, 6-7 (A155-56); T. 9/28/12 at 149, 153-54, 218-20 (A104-105, A121).)[1] These were the individuals who admitted actually filling out the false

---

[1]  Despite their admitted participation in a multi-million dollar bank and mortgage fraud scheme – of which Mr. Trudeau was *acquitted* – and despite Joseph Kriz's admission that he had also stolen millions of dollars from his client security account to fund his gambling, Judge Hall gave them each dramatically more lenient sentences than she imposed on Mr. Trudeau.  Joseph Kriz, who pleaded guilty to one count of conspiracy to commit bank fraud, one count of fraud in loan and credit applications, and one count of mail fraud, was sentenced by Judge Hall to 30 months imprisonment. *United States v. Kriz,* 08-cr-171 (JCH) (D. Conn. June 7, 2013) (Supplement of Unreported Authorities ("S_") at S17).  Fred Stevens pleaded guilty to bank fraud, and Judge Hall sentenced him to a year and a day in prison. *United States v. Stevens*, 08-cr-250 (JCH) (D. Conn. April 17, 2013) (S13). John Bryk and Tom Preston each pleaded guilty to conspiracy to make false statements on loan documents, and each was sentenced to just two years of probation, also by Judge Hall. *United States v. Bryk,* 11-cr-62 (JCH) (D. Conn. March 16, 2013) (S10); *United States v. Preston*, 09-cr-223 (JCH) (D. Conn. March 16, 2013) (S7).  Similarly, Heather Bliss pleaded guilty to one count of conspiracy to defraud the United States and Judge Hall sentenced her to 30 months imprisonment. *United States v. Bliss*, 09-cr-00224 (JCH) (D. Conn. Feb. 15, 2013) (S3).  In contrast, as discussed below, Judge Hall sentenced Mr. Trudeau, who was convicted only on the Agah wire fraud count, which resulted in no loss, and the conspiracy count, which clearly had as its object the Agah transaction, to almost 16 *years* in prison.

paperwork, identifying vulnerable lenders, conducting fraudulent closings, and otherwise deceiving banks and mortgage lenders. Pursuant to their plea agreements with the government, each man admitted to having played a principal role in carrying out the alleged bank and mortgage frauds. (Closing Arg. at 33 (A163).) But each of these professionals tried to pin the blame on Mr. Trudeau, a man with only a high school education, testifying at trial that it was actually he who had induced and orchestrated all of their crimes. (*See, e.g.*, T. 9/27/12 at 47-51, 63, 65, 91 (A54-55, A58-59, A65); T. 9/28/12 at 27-28, 32, 39, 63, 179, 185-86, 191-92, 222 (A73-76, A82, A111-14, A122); T. 10/1/12 at 63, 105-106, 173-74, 179 (A299, A310, A327-28); T. 10/2/12 at 36-37, 76, 83, 123 (A339-40, A349, A351, A361); T. 10/3/12 at 20-21 (A130-31).) As discussed below, the jury thoroughly rejected that testimony.

By contrast, the government's case as to Count 9 was built around the testimony of two upstanding citizens, citizens whom the jury clearly found to be credible. They were: James Agah, a hedge fund manager and private investor who was a family friend of Mr. Trudeau and his wife; (T. 10/3/12 at 49-73 (A138-44)); and Dr. Ralph Finger, an emergency room physician. (*Id.* at 73-80 (A144-45).) Mr. Agah testified that the primary reason he loaned money to Mr. Trudeau to finish the home at 9 Fragrant Pines was Mr. Trudeau's representation that the would-be buyer had signed a purchase agreement. (*Id.* at 56 (A139).) Dr. Finger

9

testified that he had in fact negotiated to purchase the property, had visited it multiple times during construction, and might even have reviewed a purchase contract, but had not signed it. (*Id.* at 76-78 (A144-145).) Mr. Agah conceded that what Mr. Trudeau had emailed him was in fact that truthful, unsigned purchase contract, not a signed forgery or any other sort of fraudulent document. (*Id.* at 71-72 (A143).) And in the end, Mr. Agah testified, he was repaid more-or-less on time, fully and with interest. (*Id.* at 56, 65, 67 (A139, A142).)

Count 9 shared virtually no factual overlap with the remaining substantive counts. None of the government witnesses who testified about the alleged mortgage fraud scheme in Counts 2 - 8 testified about the allegations in Count 9, nor did the government allege their involvement in the transaction. There is no indication that Mr. Agah ever met any member of the alleged conspiracy, aside from Mr. Trudeau and his wife. (*Id.* at 52 (A52).) Nor was there any evidence that the proceeds of his loan were used in conjunction with any of the alleged mortgage frauds. The evidence as to Count 9 revolved around a separate and distinct core of facts, which transpired more than two years after the mortgage fraud scheme allegedly ended, and indicated a distinctly different role played by Mr. Trudeau than the evidence supported for the other counts.

**The Jury Is Instructed on Aiding and Abetting and Conspiracy**

At the close of trial, with regard to Counts 2 - 9, the judge repeatedly charged the jury that if they found Mr. Trudeau not guilty of directly committing a charged offense, they must then consider in the alternative whether he had aided or abetted the commission of that crime. (Jury Charge at 47-49, 57-59, 63-69 (A183-89).) Six full pages of the jury charge were dedicated to explaining aider and abettor liability. (*Id.* at 63-69 (A187-89).) The judge explained that under Section 2 of Title 18 of the United States Code, even if Mr. Trudeau did not commit any of the offenses alleged in Counts 2 - 9, he must be found guilty if the jury concluded that he aided, abetted, counseled, commanded, induced, procured, or caused those offenses. (*Id.* at 64 (A187).)

With regard to Count 1, the jury also was charged repeatedly that the objects of the alleged conspiracy were *exactly the same* as the substantive offenses charged in Counts 2 - 9. (*Id.* at 26-27, 30-32 (A178-79).) Finally, the court defined the essential element of participation in the conspiracy as follows: "In sum, Mr. Trudeau, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking." (*Id.* at 36 (A180).)

In other words, the jury was simultaneously advised that (1) if they agreed that Mr. Trudeau had *committed, aided, abetted, counseled, commanded, induced,*

11

*procured, or caused* the commission of any of the substantive offenses charged in Counts 2 - 9, they must convict on that Count; and (2) if they agreed that Mr. Trudeau had *engaged, advised, or assisted* in the commission of any of those crimes, they must convict him of conspiracy as well. The court did not instruct the jury that there was any material or legally significant difference between engaging, advising, or assisting, on the one hand, versus, say, inducing, counseling, or abetting on the other.

### The Jury Finds Mr. Trudeau Not Guilty on Counts 2 - 8, Which Also Comprise the Objects of the Alleged Conspiracy Charged in Count 1

After weighing all of the evidence, the jury found Mr. Trudeau not guilty of committing or aiding or abetting the commission of the mortgage frauds charged in Counts 2 - 8. The jury did find Mr. Trudeau guilty on Count 9, the Agah wire fraud charge that the government acknowledged was its "purest" charge. (Closing Arg. at 65 (A171).) The jury also returned a verdict of guilty on the conspiracy charged in Count 1.

### The District Court Finds That Notwithstanding the Jury's Verdict, Mr. Trudeau Committed All of the Charged Offenses and Sentences Him as if He Were So Convicted

At sentencing, the district court made clear that it disagreed with the jury's verdict, and then sentenced Mr. Trudeau as if he had been convicted of all counts.

The district court began calculating Mr. Trudeau's sentence under the Federal Sentencing Guidelines by noting that the Count 9 conviction on the Agah

wire fraud translated into a base offense level of 7. (Sent. Hearing at 75 (A261).)

The court noted several times that there was no loss attributable to this transaction.

(*Id.* at 33 (A251).) Accordingly, the recommended Guidelines sentencing range

would have been 8 - 14 months, based on a criminal history category IV.[2]

U.S.S.G. § 5A.[3]

    The district court then proceeded to find, by a mere preponderance of the

evidence, that Mr. Trudeau did in fact commit all of the various offenses alleged in

the Indictment and the Presentence Report (PSR) (which admittedly was drafted in

large part by the government (Def's Obj. at 2 (A193)), including those the jury had

rejected. (Sent. Hearing at 31 (A250).) In so doing, the court essentially adopted

the PSR without discussion. (*Id.* at 56, 79, 82 (A256, A262-63).) Stating "I'm not

going to reiterate each and every fact set forth within these paragraphs," the district

---

[2]     It is unclear what conclusion the court ultimately reached with regard to Mr. Trudeau's criminal history. After first calculating it at a category IV, the judge said "I think the government has asked me to depart upward for understatement of criminal history." (Sent. Hearing at 80 (A262).) She later appeared to raise Mr. Trudeau's criminal history to category V. (*Id.* at 125 (A274).) But she apparently had decided from the outset to sentence him as a category IV offender no matter what; she stated "Given what the Court, is going to do, I don't know [that departing upward to category V is] terribly important here." And she ultimately imposed a sentence at the bottom of the Guidelines range for a level 33/category IV offender, without any clear explanation as to why she was not sentencing within the category V range. (*Id.* at 125-26, 134, 139 (A274, A276-77).) Even the probation officer appeared confused by this "departure." (*Id.* at 139 (A77).) Accordingly, in this brief, appellant will assume for purposes of comparison that Mr. Trudeau was sentenced as a level 33, Category IV offender.

[3]     Unless otherwise noted, all references are to the 2012 Guidelines in effect at the time of Defendant's sentencing.

judge simply offered a one-paragraph summary of the alleged bank fraud scheme and her belief that Mr. Trudeau was its lead actor. (*Id.* at 56 (A256).) She did not weigh any evidence. She did not make any express findings as to the credibility of the government's witnesses. She gave no indication as to why she was rejecting the jury's conclusions as to Counts 2 - 8. She disclosed only that her own conclusions were

> based upon what I have heard in connection with and seen in connection with various pretrial proceedings including hearings on status pending sentencing, based upon evidence and both testimony and documentary that I have seen and heard and reviewed in connection with the trial, based also on other evidence that's come before the Court in connection with the preparation for sentencing and otherwise . . . .

(*Id.*)

Furthermore, the district judge offered no explanation whatsoever for her finding, also by a mere preponderance of the evidence, that all of the offenses she (as opposed to the jury) found Mr. Trudeau to have committed "were part of the same course of conduct or common scheme or plan as the offense of conviction." (*Id.* at 31 (A250).)

The court then proceeded to increase Mr. Trudeau's offense level 26 levels, from 7 to 33. The increase was based *entirely* on the judge's own findings, by a preponderance of the evidence, that regardless of the jury's verdict Mr. Trudeau had engaged in the conduct alleged in Counts 2 - 8. Based on its findings the court

14

imposed: an 18-level enhancement for mortgage losses of more than $2.5 million, a two-level enhancement for more than ten victims, a two-level enhancement for losses of over $1 million attributable to a federally insured financial institution, and a four-level enhancement for leading a conspiracy of five or more people. (*Id.* at 59-65, 75 (A257-59, A261).) The result was a sentence of 188 months, more than 20 times the minimum for a Criminal History Category IV, Offense Level 7 offender. (*Id.* at 134 (A276)); U.S.S.G. § 5A.

The court also held Mr. Trudeau personally responsible for restitution of more than $4 million in losses relating to the bank and mortgage fraud charges, including funds that attorney Joseph Kriz stole from client trust accounts. (Sent. Hearing at 124 (A273).) By contrast, the court found, and the government did not dispute, that *no losses* resulted from the one substantive crime of which Mr. Trudeau was actually convicted: his misrepresentations to Mr. Agah, whose loan was repaid in full with interest. (*Id.* at 33 (A251).)

The district judge indicated that her approach to sentencing was required by the Sentencing Guidelines and mandated by this Court's precedent as well as by *United States v. Watts*, 519 U.S. 148 (1997). (Sent. Hearing at 27-28, 34-36 (A249-51).)

## SUMMARY OF THE ARGUMENT

On appeal, Mr. Trudeau contends that the district court's reliance on judicial fact-finding to increase his sentence more than 20-fold over that authorized by the jury verdict was improper for five independent but interrelated reasons.

First, the court misapplied the Federal Sentencing Guidelines by treating the conviction on Count 1 as ambiguous and assuming that the court was therefore free to find for itself which crimes Mr. Trudeau had conspired to commit. The nature of the jury instructions, the manner in which the government tried the case, and the jury's ultimate determination that Mr. Trudeau was guilty of Count 9 but not of Counts 2 - 8 left no doubt that the jury intended to convict him only of conspiracy to commit the Count 9 Agah fraud. The Guidelines did not authorize the court to find that he had conspired as to other, more serious crimes.

Second, the district court violated Mr. Trudeau's Sixth Amendment rights by failing to apply the General Verdict Rule. That rule requires that a conviction as to a multi-object conspiracy be treated as a conviction on either (1) the least serious object offense or (2) the object offense of which the defendant was convicted as a principal. To the extent that this Court has held otherwise, that holding is no longer tenable in light of the Supreme Court's recent Sixth Amendment jurisprudence.

16

Third, the Guidelines, as interpreted and applied by the court, are unconstitutional as applied to conspiracies to commit certain types of crimes. The district court interpreted the Guidelines to mean that individuals who are convicted of conspiring to commit crimes with discrete harms, such as blackmail or solicitation of pornography, are entitled to have each object of the alleged conspiracy found beyond a reasonable doubt for sentencing purposes, whereas the objects of conspiracies to commit crimes with fungible harms, such as fraud or *possession* of pornography, may be found on a mere preponderance of the evidence. Denying basic procedural protections based on this irrational and arbitrary distinction violates the Due Process Clause of the Fifth Amendment.

Fourth, the court violated Mr. Trudeau's due process rights by imposing a sentence based on judicial fact-finding that dramatically overshadowed what was authorized by the jury verdict. Conviction on Count 9 and conspiracy to commit that same crime would have translated into a Guidelines offense level of 7, and, for Mr. Trudeau, a sentence range of just 8-14 months. By contrast, the court's belief that Mr. Trudeau had in fact committed all of the crimes of which the jury acquitted him raised his offense level by 26 levels and increased his sentence more than 20-fold.

17

Fifth, in light of the Supreme Court's recent decision in *Alleyne v. United States,* 133 S. Ct. 2151 (2013), it is no longer tenable to conclude that the Fifth and Sixth Amendments permit a trial court to increase a defendant's sentence based on acquitted conduct. Sentencing someone for crimes of which they have been found not guilty undermines respect for the law, the traditional role of the jury as a bulwark against government abuses, and other basic constitutional protections.

## STANDARD OF REVIEW AND PRESERVATION

This Court reviews challenges to the constitutionality of a sentencing guideline *de novo. United States v. Hudson*, 972 F.2d 504, 506 (2d Cir. 1992). The district court's application of the Guidelines is also subject to *de novo* review. *United States v. Drayer*, 364 F. App'x 716, 719 (2d Cir. 2010).

At sentencing, Mr. Trudeau argued that (1) the acquittal on Counts 2 - 8 necessarily meant that the jury had found that Mr. Trudeau did not conspire as to those crimes (Sent. Hearing at 23-27 (A248-49)); (2) Guidelines §§ 1B1.2(d) and 3D1.2, as interpreted by the district court and as applied to his case, violated his Fifth and Sixth Amendment rights (Sent. Memo at 4-15 (A195-206); Sent. Hearing at 26-27 (A249), arguing that objects of conspiracy must be proved beyond a reasonable doubt, and appealing to jury right under *Apprendi v. New Jersey,* 530 U.S. 466 (2002)); (3) the sentence imposed was disproportionately high relative to Mr. Trudeau's crimes (Sent. Hearing at 110, 114 (A270-71)); and (4) consideration

of acquitted conduct under the Guidelines violates the Fifth and Sixth Amendments (*id.* at 28 (A249)). Accordingly, these challenges are preserved for appellate review.[4]

## ARGUMENT

**I.  BY REJECTING THE JURY'S DETERMINATION OF THE OBJECT OF THE MULTI-OBJECT CONSPIRACY CHARGED IN COUNT ONE, THE COURT ERRED IN ITS APPLICATION OF THE SENTENCING GUIDELINES**

Under the Federal Sentencing Guidelines, the process of sentencing begins by identifying the most serious crime of conviction. U.S.S.G. §§ 1A3.1, Auth. Disc. § 1; 1B1.1, App. Note 5. This determination forms the basis for the analysis that follows. In fact, the crime or crimes of conviction establish the very foundation for sentencing by determining the governing Guideline regime. *See* U.S.S.G. App'x A; *United States v. Bradley*, 644 F.3d 1213, 1301 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 2375 (2012).

Usually this process is straightforward. A defendant has been convicted of a particular count in an indictment or information, and that count corresponds to a specific offense. In the case of a conspiracy charge that alleges multiple objects, it

---

[4]    To the extent this Court finds any of Mr. Trudeau's arguments unpreserved because their presentation at trial did not precisely mirror the characterization herein, plain error review would be appropriate given the importance of the constitutional rights involved and the dramatic impact on the length of the resulting sentence. *See United States v. Reyes*, 691 F.3d 453, 457 (2d Cir. 2012); *United States v. Carpenter*, 287 F. App'x 131, 133 (2d Cir. 2008); *Hudson*, 972 F.2d at 506.

is sometimes more involved, because a sentencing court must identify precisely which object or objects the defendant is culpable for. And this determination can have significant consequences.

Where there has been a conviction of a so-called multi-object conspiracy, the starting point is § 1B1.2(d) of the Sentencing Guidelines. That section provides:

> A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for *each offense* that the defendant conspired to commit.

(Emphasis added.) In other words, conviction of a multi-object conspiracy is actually treated under the Guidelines as multiple convictions if the defendant is determined to be culpable for multiple objects of the conspiracy. In this instance, therefore, the Guidelines are, in reality, providing a framework for determining the counts of conviction, rather than merely the sentence.

As the Commentary to the Guidelines reflects, the objects of a conspiracy may be clear from the verdict returned by the jury. The clearest expression of the jury's determination of the objects of a conspiracy would be in a special verdict form that specifically identifies the objects of the conspiracy on which the defendant was convicted. Special verdict forms are, however, disfavored in the Circuit; *United States v. Orozco-Prada*, 732 F.2d 1076, 1084 (2d Cir. 1984); and none was used in this case.

20

The jury's determination of the objects of a conspiracy may also be evident from the circumstances. In *Orozco-Prada*, the Second Circuit cited with approval the Seventh Circuit's decision in *United States v. Peters*, 617 F.2d 503, 506 (7th Cir. 1980), in which that court stated that "since the jury convicted defendant of the offenses . . . that were the objects of the alleged conspiracy, it is reasonable to conclude that the jury found defendants guilty of a conspiracy to commit [those] substantive offenses." *See also United States v. Scotti*, 47 F.3d 1237, 1247 (2d Cir. 1995) (common sense and experience dictate that jury will find defendant guilty of conspiring to commit and committing same crime); *United States v. Regan*, 946 F.2d 188 (2d Cir. 1991) (similar).

That is precisely what happened in this case. The jury convicted Mr. Trudeau of the multi-object conspiracy charged in Count 1 and of the substantive crime in Count 9, which was one of the objects of the conspiracy. The jury acquitted Mr. Trudeau of all of the other offenses that were charged as objects of the conspiracy. It was, therefore, clear that the jury determined that the object of the conspiracy was the offense charged in Count 9.

The Commentary to the Guidelines indicates that it is only where it is unclear what the jury intended that the court itself may determine the objects of the conspiracy, doing so only, however, with "particular care" and, in most cases, only to the extent the court finds such objects established beyond a reasonable doubt.

21

U.S.S.G. § 1B1.2, App. Note 4. This admonition to use special care and a heightened burden of proof appears to reflect a recognition that a court's determination of the objects of the conspiracy, which effectively determines the counts of conviction, raises potentially significant Fifth and Sixth Amendment issues. *Id.*, Auth. Disc. § 3.

The district court in this case did not consider whether the circumstances reflected the jury's determination of the object of the conspiracy. Instead, it simply took for itself the task of deciding the objects of the conspiracy. The court made quick work of this, summarily finding by a mere preponderance of the evidence that Mr. Trudeau committed each and every one of the objects of the charged conspiracy. (The court went on to find that Mr. Trudeau had committed *all* of the acts alleged in the Indictment, notwithstanding that he was acquitted of seven of the nine charged counts.) (Sent. Hearing at 31, 56 (A250, A256).)

The court's process for determining the objects of the conspiracy alleged in Count 1 of the Indictment was erroneous. As noted, it was abundantly clear from the circumstances that the jury itself had evaluated the potential objects of the conspiracy and determined that the only object of conviction was the Agah transaction as charged in Count 9.

The jurors were directed to look at the substantive crimes in Counts 2 - 9 and determine if they could agree, unanimously, beyond a reasonable doubt, that Mr.

22

Trudeau conspired to commit them. (Jury Charge at 30 (A179).) The jury was also instructed that to find Mr. Trudeau guilty of the conspiracy in Count 1 they were required to agree unanimously that a given object was undertaken, and that such a finding would have to be beyond a reasonable doubt. And the jury was expressly instructed that the objects of the Count 1 multi-object conspiracy were exactly the same as the substantive crimes charged in Counts 2 - 9. (*Id.* at 26-27, 30-32 (A178-79).)

The government also emphasized this point throughout its case, making clear that this was not a situation in which Mr. Trudeau was merely alleged to have been a passive co-conspirator, but that his role in the conspiracy was the same as that charged in the substantive counts – that of an active participant, involved in every detail of the scheme, usually directing the actions of others. (Closing Arg. at 2-4, 13-32 (A155, A158-62)). In its closing argument, the government said others merely *helped* Mr. Trudeau to "lie, cheat and steal." (*Id.* at 7, 9 (A156-57).) The government told the jury that each participant discussed his specific crimes with Mr. Trudeau. (*Id.*) The government listed numerous specific "overt acts" that Mr. Trudeau allegedly performed or "orchestrated." (*Id.* at 13-34 (A158-63).) In sum, the government's theory of the case was that Mr. Trudeau was "driving the bus" of criminality. (*Id.* at 33 (A163).)

23

To hedge its bets, however, the government sought and received an expansive aiding and abetting charge. The judge explained that even if Mr. Trudeau did not commit any of the offenses alleged in Counts 2 - 9, he must be found guilty if the jury concluded that he aided, abetted, counseled, commanded, induced, procured, or caused them. (Jury Charge at 64 (A187).) The jury was thus given wide latitude to convict Mr. Trudeau of the substantive offenses charged in Counts 2 - 9, which also made up the objects of the Count 1 conspiracy.

The jury was, therefore, simultaneously advised that (1) if they agreed that Mr. Trudeau had *committed, aided, abetted, counseled, commanded, induced, or procured* the commission of any of the substantive offenses charged in Counts 2 - 9, they must convict on that Count; and (2) if they agreed that Mr. Trudeau had *engaged, advised, or assisted* in the commission of any of those crimes, they must convict him of conspiracy as well. (*Id.* at 36, 64 (A180, A187).) Those instructions were consistent with this Circuit's case law indicating that the margin between conspiracy and aiding/abetting can be exceedingly thin. *See, e.g., Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 843 n.7 (2d Cir. 1998) (noting "substantial overlap" between conspiracy and aider/abettor liability); *United States v. Delia*, 749 F. Supp. 500, 505 (S.D.N.Y. 1990) ("[W]e note the shadowy and perhaps arcane distinctions between conspiracy and aiding and abetting and find that to dismiss the substantive counts

24

in this case while retaining the conspiracy charge would exalt form over substance."), *aff'd*, 944 F.2d 1010 (2d Cir. 1991); *cf. United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) (conspiracy involves *mens rea* beyond that required for aiding and abetting).

When the jury returned a conviction on Count 9, not guilty verdicts on Counts 2 - 8, and a conviction on the Count 1 conspiracy, it was clear what they had intended. They had determined that Mr. Trudeau committed the Agah wire fraud charged in Count 9; that Mr. Trudeau neither committed, nor aided or abetted the commission of, the mortgage fraud offenses in Counts 2 - 8; and that Mr. Trudeau conspired to commit the Agah wire fraud, which was one of the objects of the Count 1 conspiracy. No other interpretation is possible given the jury instructions and the government's presentation of the case.

Under the Sentencing Guidelines, therefore, it was improper for the court to take for itself the task of determining the object(s) of the multi-object conspiracy. The jury had already done so. The Sentencing Guidelines do not permit the court to overrule the jury's determination on this point. The court, therefore, erred in applying § 1B1.2(d) of the Guidelines.

25

II.  **TO THE EXTENT THE JURY ISSUED A GENERAL VERDICT ON THE COUNT ONE MULTI-OBJECT CONSPIRACY, THE COURT'S JUDICIAL FACT-FINDING PURSUANT TO THE SENTENCING GUIDELINES VIOLATED MR. TRUDEAU'S SIXTH AMENDEMENT RIGHTS**

As explained above, conviction of a multi-object conspiracy is treated under the Guidelines as multiple convictions, one for each object of the conspiracy. The Sentencing Commission recognized that this multi-object conspiracy Guideline poses a particular challenge in the face of a general verdict. In the Commentary to the Guidelines, the Commission, therefore, directed "[p]articular care," and sought to address how a court should approach such a situation:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count *if the court, were it sitting as a trier of fact,* would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under §3D1.2(d) (e.g., a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because §1B1.3(a)(2) governs consideration of the defendant's conduct.

U.S.S.G. § 1B1.2, App. Note 4 (emphasis added).

The highlighted language has been taken to mean that the trial court must find that a defendant conspired to commit each alleged object of the conspiracy beyond a reasonable doubt. *United States v. Macklin*, 927 F.2d 1272, 1280 (2d Cir. 1991); U.S.S.G. § 1B1.2, Auth. Disc. § 3.

The imposition of a heightened standard of proof, while likely intended to address Fifth Amendment due process concerns by requiring proof beyond a reasonable doubt (*but see* Section III, *infra*), does nothing to address the *Sixth* Amendment's requirement that criminal offenses be determined by a jury.

Prior to the adoption of the Sentencing Guidelines, this Court recognized the Sixth Amendment implications of a general verdict on a multi-object conspiracy. These constitutional concerns informed the adoption of the so-called General Verdict Rule, whereby a general verdict on a multi-object conspiracy must be presumed for purposes of sentencing to mean that the defendant was found guilty only of conspiring to commit the object representing the *least* serious crime. *See United States v. Zillgitt*, 286 F.3d 128, 131, 140 (2d Cir. 2002); *Orozco-Prada*, 732 F.2d at 1083-1084 (collecting cases). The only potential exception to the General Verdict Rule was in cases in which the jury's determination of the object of the conspiracy was evident from the circumstances, such as when the jury convicted a defendant of a multi-object conspiracy and one or more substantive offenses corresponding to those objects. *Id.* at 1084.

Following adoption of the Sentencing Guidelines, at least one Circuit concluded that § 1B1.2(d) runs afoul of the Sixth Amendment jury right. *See United States v. Bush*, 70 F.3d 557, 561 (10th Cir. 1995) (requiring proof of each object of conspiracy beyond a reasonable doubt and concluding that "the procedure

authorized in [§ 1B1.2(d) and the accompanying Notes] would have violated the Fifth and Sixth Amendments by taking this issue away from the jury and placing it in the hands of the judge").

The Second Circuit considered the constitutionality of § 1B1.2(d) and the associated Commentary[5] in *United States v. Malpeso*, 115 F.3d 155, 167 (2d Cir. 1997), and, relying on *Malpeso*, again in *United States v. Robles*, 562 F.3d 451, 456 (2d Cir. 2009). In *Malpeso*, the Court rejected the constitutional challenge for two reasons: the Court believed that such a challenge was foreclosed by the Supreme Court's decision in *Griffin v. United States*, 502 U.S. 46 (1991), and it relied on the proposition that whereas each element of a criminal offense must be found by a jury beyond a reasonable doubt, anything characterized as a "sentencing factor" need only be found by a judge by a preponderance of the evidence. *Malpeso*, 115 F.3d at 168; *see also Robles*, 562 F.3d at 456-57.

Neither rationale for upholding the constitutionality of § 1B1.2(d) can survive the past 15 years of federal sentencing jurisprudence. Indeed, just a year after deciding *Malpeso* this Court acknowledged that *Griffin* does not address – let alone resolve – the question how to sentence under a general verdict on a multi-object conspiracy. *See United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998). Rather, the holding of *Griffin* was limited to the question whether there was

---

[5]     Under the version of the Guidelines then in force, current Application Note 4 was numbered Note 5.

sufficient evidence to *sustain a conviction* on a multi-object conspiracy where the record supported conviction as to one possible object but not another. *Id*. Consistent with that reading of *Griffin*, the Court concluded in *Barnes* that a general conviction on an indictment charging conspiracy to possess multiple controlled substances must be deemed to be a conviction of conspiracy to possess the controlled substance that carries *the most lenient* statutorily prescribed sentence. *Id*. at 668.[6]

*Malpeso*'s distinction between elements of a crime and sentencing factors also is no longer tenable. The framework for distinguishing between elements of a crime and sentencing factors on constitutional grounds was borne of the Supreme Court's decision in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986). *See Alleyne*, 133 S. Ct. at 2156. The notion that elements of a crime can be easily distinguished from mere sentencing factors for purposes of applying the Fifth and Sixth Amendments began to come under attack, however, in *Jones v. United States*, 526 U.S. 227 (1998). The rigidity of the distinction has since been eroded by a series of decisions in which the Supreme Court has embraced an increasingly expansive view of the rights of the criminal defendant to have *any* fact that increases the range of penalties for a crime charged in an indictment, submitted to a jury, and

---

[6]     *Edwards v. United States*, 523 U.S. 511 (1998), is not controlling. In that case, the Court did not reach the constitutional challenges raised here.

proven beyond a reasonable doubt. *See, e.g.*, *Apprendi v. New Jersey,* 530 U.S. 466, 478 (2002) (noting that there was no distinction between offense elements and sentencing factors at common law); *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (trial judge may not find aggravating factors necessary to impose death penalty); *Blakely v. Washington*, 542 U.S. 296, 303-305 (2004) (judicial finding of aggravating sentencing factors in determinate sentencing regime violates Sixth Amendment); *United States v. Booker*, 543 U.S. 220, 245 (2005) (similar with regard to federal Guidelines, and thus rendering Guidelines advisory); *Cunningham v. California*, 549 U.S. 270, 293-94 (2007) (rejecting constitutionally significant distinction between sentencing enhancements relating to offense and those relating to nature of offender). As Justice Stevens explained in his concurrence in *United States v. O'Brien*:

> Not only was *McMillan* wrong the day it was decided, but its reasoning has been substantially undermined – if not eviscerated – by the development of our Sixth Amendment jurisprudence in more recent years. We now understand that "[i]t is unconstitutional [under the Sixth Amendment] for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed."

130 S. Ct. 2169, 2182 (2010) (Stevens, J., concurring) (alterations in original) (citation omitted). This evolution continued with the Supreme Court's recent decision in *Alleyne,* in which the Court explicitly overruled *McMillan*'s holding – as well as that of *Harris v. United States*, 536 U.S. 545 (2002) – that facts that

increase the mandatory minimum sentence to which a defendant is subject are sentencing factors that need not be found by a jury. *Alleyne,* 133 S. Ct. at 2161-62.

In light of this Supreme Court jurisprudence, the Court should recognize that it is no longer tenable to suggest that whether a defendant engaged in a conspiracy to commit a particular crime is merely a "sentencing factor" and thus immune to Sixth Amendment protections.

It bears emphasizing that Mr. Trudeau is *not* asking this Court to hold that all fact-finding that impacts a Guidelines calculation must be performed by a jury. The Supreme Court made clear in *Alleyne* that "*Apprendi*-land" is not yet that capacious. *See Alleyne,* 133 S. Ct. at 2163. Rather, what offends the Sixth Amendment is a judicial determination that a defendant has committed a particular crime – a conspiracy to achieve a particular illegal object.

As noted above, the crime or crimes of conviction establish the very foundation for sentencing by determining the governing Guideline regime. *See* U.S.S.G. App'x A; *Bradley*, 644 F.3d at 1301. More fundamentally, that the Guidelines permit a judge to find the object of conspiracy is troubling for precisely the reason the Commission chose to require proof beyond a reasonable doubt: "'A higher standard of proof should govern the creation of what is, in effect, a new count of conviction for the purposes of Chapter Three . . . .'" *Macklin*, 927 F.2d at 1280 (citation omitted).

The determination that one has committed a felony carries with it a moral and legal opprobrium apart from any sentence subsequently imposed. And it has long been recognized that the Sixth Amendment confers the right to have the appropriateness of imposing that opprobrium determined by a jury of one's peers, rather than by the State. *See Lewis v. United States*, 518 U.S. 322, 334 (1996) ("Opprobrium attaches to conviction of [serious] crimes regardless of the length of the actual sentence imposed, and the stigma itself is enough to entitle the defendant to a jury. *See* J. Proffatt, Trial by Jury 149 (1877).").

This Court should therefore find that permitting a sentencing judge to determine the objects of a conspiracy, as occurred here, violates the Sixth Amendment.

### III. TO THE EXTENT THE COURT PROPERLY APPLIED THE SENTENCING GUIDELINES FOR MULTI-OBJECT CONSPIRACIES, SUCH APPLICATION VIOLATED MR. TRUDEAU'S FIFTH AMENDEMENT RIGHTS

The district court determined that it could find the objects of the Count 1 conspiracy by applying a preponderance of the evidence standard. Even assuming the determination of the objects of the conspiracy was the proper province of the court, the Fifth Amendment requires the court to make such a finding beyond a reasonable doubt. *See Bradley*, 644 F.3d at 1301.

As noted above, the authors of the Guidelines themselves acknowledge that the "beyond a reasonable doubt" requirement implicit in Application Note 4 to

§ 1B1.2(d) is mandated by the Fifth Amendment's Due Process Clause, even under an advisory Guidelines regime. They cite post-*Booker* case law for the proposition that "[n]o due process violation occurs because § 1B1.2(d) requires the sentencing court to apply the 'beyond a reasonable doubt' standard of proof to determine the objects of the conspiracy." U.S.S.G. § 1B1.2, Auth. Disc. § 3.

Curiously, however, the Commentary to the Guidelines indicates that there are situations in which a court need not apply the beyond a reasonable doubt standard in determining objects of a conspiracy. Application Note 4 to §1B1.2 indicates that "if the object offenses specified in the conspiracy count would be grouped together under §3D1.2(d) (e.g., a conspiracy to steal three government checks) it is not necessary to [apply the beyond a reasonable doubt standard], because §1B1.3(a)(2) governs consideration of the defendant's conduct." The upshot of this odd distinction is that the beyond a reasonable doubt standard applies to individuals convicted of conspiring to commit crimes subject to grouping under §§ 3D1.2(a), 3D1.2(b), or 3D1.2(c) of the Guidelines, but not to those convicted of conspiracies grouped under § 3D1.2(d).

There is no constitutionally viable reason why one convicted of conspiracy to commit various types of extortion or blackmail should be entitled to fundamental procedural protections, whereas one convicted of conspiracy to commit bank or wire fraud is not. U.S.S.G. § 3D1.2(d). Why payments to obtain

public office are protected, but bribing public officials or violating election laws is not. *Id*. Why possessing contraband in prison is protected, but possessing marijuana or amphetamines is not. *Id*. Why advertising for or permitting minors to engage in the production of pornography is protected, but trafficking in or possessing pornography is not. *Id*. This simply makes no sense.

In theory, § 3D1.2(d) is used to group together "misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." *United States v. Mullins*, 971 F.2d 1138, 1143 (4th Cir.1992). Even assuming, *arguendo*, that § 3D1.2(d) does distinguish successfully between (1) ongoing crimes involving fungible harms and (2) discrete crimes involving unique harms – a dubious assumption at best – one is still hard pressed to find a *rationale* for requiring that only the latter harms be determined beyond a reasonable doubt prior to sentencing.

The only guidance offered by the Guidelines is the cryptic comment in the escape clause to Note 4 that the convictions are treated differently because "§ 1B1.3(a)(2) governs consideration" of the more fungible types of crimes. This is little help. Section 1B1.3(a)(2) – together with its sister section 1B1.3(a)(1), which applies to non-fungible crimes – is in the section of the Guidelines addressing which sorts of conduct may be relevant for the purposes of sentencing. Section 1B1.3(a)(1) indicates that conduct performed by the defendant or (under

34

certain circumstances) his/her coconspirators may be taken into account when sentencing. The only difference in §1B1.3(a)(2) is that, for fungible-type crimes, relevant conduct is restricted to that which is part of a common scheme or plan. That restriction does nothing to alleviate the due process violation that ensues when a judge finds by a mere preponderance of the evidence that a defendant has committed additional crimes.

Indeed, having hinged so much on the arbitrary distinction between § 1B1.3(a)(1) and § 1B1.3(a)(2), the Guidelines **immediately proceed to ignore it**. According to the Guidelines, the due process rights of a defendant convicted of a multi-object conspiracy to commit fungible-harm crimes are supposedly protected because those crimes are governed by § 1B1.3(a)(2). But in the lengthy commentary to § 1B1.3, the Guidelines provide numerous examples of fungible-harm crimes – crimes that are identified as such in the list following § 3D1.2(d) – that are to be evaluated under § *1B1.3(a)(1)*. *See, e.g.,* U.S.S.G. § 1B1.3 App. Notes 2(a)(1) (combining volumes of off-loaded marijuana); 2(c)(2) (combining proceeds of mail and stock fraud); 2(c)(4) (aggregating quantities of child pornography); 2(c)(6) (combining illegal drug sales); 2(c)(8) (similar).

Mr. Trudeau is aware of only one court to have considered the question whether the arbitrary distinction drawn by § 1B1.2 offends due process. In *United States v. Bradley*, the defendant was convicted by general verdict on a charge that

he conspired to commit five money laundering objects. 644 F.3d at 1300.

Pursuant to § 1B1.2(d) and Application Note 4, the trial court grouped the five

conspiracy objects under § 3D1.2(d) and sentenced him as if he had been convicted

on five separate counts of conspiracy, without first finding beyond a reasonable

doubt that he had conspired as to each. *Id*. On appeal, the Eleventh Circuit

reversed, holding that the fact that the five charged conspiracies were subject to

grouping for the purposes of § 1B1.3(a)(2) "does not obviate the district court's

core responsibility to identify beyond a reasonable doubt the object offense that

drove the conviction." *Id*. at 1301. Remanding for the resentencing of two co-

defendants, the Court adopted a bright-line rule that "when confronted with a

multi-object conspiracy in conjunction with a general jury verdict, a district court

is required to make a finding as to which object offense drove the conviction." *Id*.

at 1302. This Court should hold the same.[7]

---

[7]     Should this Court conclude that *no* criminal defendants are entitled to have
the objects of a multi-object conspiracy determined beyond a reasonable doubt
prior to sentencing, Mr. Trudeau submits – for substantially the same reasons as
discussed above – that the Guidelines regime would then deprive him of the equal
protection of the law, as it would afford extra procedural protections to other,
similarly situated individuals without any rational basis.
        Mr. Trudeau argued at sentencing that where the objects of a multi-object
conspiracy are plausibly groupable under either § 3D1.2(d) or another subsection
of § 3D1.2, the court should afford the defendant the procedural protections of
Note 4 to § 1B1.2(d), regardless of whether the trial court in fact groups under
§ 3D1.2(d), and stop the analysis there, rather than proceeding to a § 3D1.2(d)
analysis. Adopting that interpretation of the Guidelines would avoid the need to
reach the constitutional issues raised in this section of Mr. Trudeau's brief.

## IV. MR. TRUDEAU'S SENTENCE WAS UNCONSTITUTIONALLY DISPROPORTIONATE TO HIS OFFENSE OF CONVICTION.

As discussed, the sections of the Guidelines dealing with multi-object conspiracies are unconstitutional to the extent they deprive a defendant of the right to have a jury of his peers determine beyond a reasonable doubt that he has committed a particular crime. If this Court disagrees, however, it should find that the sentence imposed as a result of the district court's fact-finding was unconstitutionally disproportionate and unreasonable based on the jury verdict.[8]

In *Alleyne* the Supreme Court rejected the notion, put forth in *McMillan,* that merely because a fact is labeled a "sentencing factor" rather than an element of a crime implies, *ipso facto*, that it is not subject to the Fifth Amendment's requirement of proof beyond a reasonable doubt. *Alleyne*, 133 S. Ct. at 2164 (Sotomayor, J., concurring). But even in *McMillan* itself, the Court suggested that a heightened standard of proof might be required if the facts used to enhance a petitioner's sentence become "a tail which wags the dog of the substantive offense" by exposing him to substantially greater or additional punishment. 477 U.S. at 88. Since *McMillan*, although some members of the Supreme Court have expressed a preference for a bright line rule restricting judicial fact-finding; *see*

---

Accordingly, Mr. Trudeau wishes to preserve those arguments and incorporates them by reference herein.

[8] For substantially the same reasons, Mr. Trudeau submits that his sentence was statutorily unreasonable under 18 U.S.C. § 3553(a).

*Blakely,* 542 U.S. at 307; others have continued to suggest that where such fact-finding is permissible a heightened standard of proof may be necessary to prevent these sorts of abuses. *See, e.g., Watts,* 519 U.S. at 156 (leaving question open); *Blakely,* 542 U.S. at 344 (Breyer, J., dissenting) ("Congress might permit a judge to sentence an individual for murder though convicted only of making an illegal lane change. . . . But that is the kind of problem that the Due Process Clause is well suited to cure." (citation omitted)).

Other Circuits have interpreted *McMillan*'s tail wagging trope to mean that judicial fact-finding that substantially increases the scope of a criminal sentence may be subject to a heightened standard of proof, and the Ninth Circuit has imposed such a standard in numerous cases. *See, e.g., United States v. Staten,* 466 F.3d 708, 717-18 (9th Cir. 2006).

This Court appeared to adopt a similar position in *United States v. Gigante,* 94 F.3d 53 (2d Cir. 1996), suggesting that:

> In our view, the preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range. In doing so, the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing **or even beyond reasonable doubt** where appropriate. **Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly.**

38

*Id.* at 56 (emphasis added.); *see also United States v. Shonubi*, 103 F.3d 1085, 1090-93 (2d Cir. 1997) (remanding for resentencing based on analogy to *Gigante*); *United States v. Outen*, 286 F.3d 622, 627 n.1 (2d Cir. 2002) (noting that this Court has consistently followed *Gigante* and "its status as a holding of this Circuit is now secure").

Several district courts initially read *Gigante* and *Shonubi* to mean that this Court was following the Ninth Circuit approach and ordered resentencing under a heightened standard of proof. *See, e.g.*, *United States v. Ayala*, 75 F. Supp. 2d 126, 137 (S.D.N.Y. 1999) (uncharged conduct must be proved beyond a reasonable doubt under *Gigante*). This Court later clarified, however, that not all sentencing factors must be filtered through a higher standard of proof. *United States v. Norris*, 281 F.3d 357, 362 (2d Cir. 2002); *see also United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008). Rather, this Court has **required** that sentencing judges depart downwardly from the Guidelines where the offense level is dramatically increased based on judicially found facts that do not meet such a standard. *Norris*, 281 F.3d at 362. In *Norris*, this Court held that "'[w]here a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court **should** depart downwardly.'" *Id.* (emphasis added) (citation omitted).

Regardless of the appropriate remedy, it is clear that the case at bar falls squarely within the ambit of *Gigante*. In that case, this Court suggested that two

factors should guide the tail wagging analysis. First, heightened scrutiny is warranted where judicial fact-finding "substantially" increases the sentencing range. 94 F.3d at 56. For example, the Ninth Circuit has found – and the government, to its credit, conceded – that a trial court erred in finding sentencing factors by a mere preponderance of the evidence where those findings increased a defendant's offense level by 15 levels, raising the lower end of the Guideline sentence range six-fold. *Staten*, 466 F.3d at 717-18.

Second, the *Gigante* Court remarked that the number of individual enhancements magnifies the already significant potential for error inherent in the preponderance standard. 94 F.3d at 56. For example, if a trial court makes six factual findings, each with a margin of error of nearly 50 percent, the mathematical likelihood that the sentence has been improperly enhanced in some respect will exceed 98 percent. *See id*.

In this case, Mr. Trudeau's sentence is a Chihuahua with the tail of a Great Dane. The substantive conviction that formed the foundation of his sentence, Count 9, was based on a misrepresentation that Mr. Trudeau and his wife made to a friend of theirs to obtain a short-term loan. The Indictment charged and the jury found they represented that they had obtained a signed purchase agreement for the house they were building at 9 Fragrant Pines, when in fact they had only been negotiating with the buyer in question. Mr. Trudeau sent Mr. Agah the actual

40

unsigned purchase agreement for the property, not a signed forgery. And Mr.

Trudeau repaid the $50,000 loan with full interest. At sentencing, the district court

determined, correctly, that there was no loss attributable to this transaction.

Accordingly, the conviction for that single misrepresentation placed Mr. Trudeau

at an offense level 7 in the Guidelines, which, taken alone, would have translated

into a recommended sentence of 8-14 months.

Instead, the trial court proceeded to find by a mere preponderance of the

evidence that (1) Mr. Trudeau led a major conspiracy (2) comprising at least four

other individuals (3) to defraud more than ten lenders (4) of more than $2.5 million

(5) including more than $1 million from financial institutions. Those findings

vaulted the sentence **26 levels**, to offense level 33. The minimum recommended

sentence for a category IV offender at that offense level – and the one imposed by

the district court – is 188 months, **more than 20 times** the minimum eight months

to which Mr. Trudeau would have been subject based on the actual jury verdict.

By way of comparison, in *Kikumura*, the Third Circuit emphasized that a 22

offense level increase that raised the defendant's sentence by a factor of twelve

represented "perhaps the most dramatic example imaginable of a sentencing

hearing that functions as 'a tail which wags the dog of the substantive offense.'"

*United States v. Kikumura*, 918 F.2d 1084, 1100-1101 (3d Cir. 1990) (citation

omitted), *overruled by United States v. Grier*, 449 F.3d 558 (3d Cir. 2006), and

41

*abrogated by United States v. Fisher*, 502 F.3d 293 (3d Cir. 2007); *see also United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991) (finding 18-level increase in offense level based on conspiracy was tail wagging the dog); *cf. United States v. O'Brien*, 130 S. Ct. 2169, 2177 (2010) (indicating that six-fold enhancement in sentence length as result of finding that defendant carried machinegun was "drastic" increase strongly suggestive of separate substantive crime).

In addition, the calculation of the base offense level and the five different enhancements found by a mere preponderance of the evidence substantially magnified the likelihood that Mr. Trudeau's sentence was calculated in error. This is particularly true in light of the fact that the jury, having been instructed that the objects of the conspiracy and the substantive crimes were the same, had already concluded there was a reasonable doubt as to whether he had actually engaged in *any* of the underlying conduct.

In *Gigante*, this Court found that due process had been satisfied in part because the trial judge in that case analyzed the testimony of each prosecution witness and explained why he found them to be credible. 94 F.3d at 57. Here, by contrast, in acquitting Mr. Trudeau on Counts 2 - 8, twelve jurors determined that they did *not* credit the testimony of the government's witnesses who testified that Mr. Trudeau's role extended beyond the conduct charged in Count 9. The district judge offered no explanation as to why she overruled the jury's verdict. Under

these circumstances, Mr. Trudeau's sentencing was unreasonable and his due process and statutory rights were violated on even the most conservative application of the principles established in *McMillan, Gigante,* and their progeny.

## V. THE SIXTH AMENDMENT BARS ANY SENTENCING ENHANCEMENTS BASED ON ACQUITTED CONDUCT

At sentencing, the district court stated that notwithstanding the jury's acquittal on Counts 2 - 8, the court concluded that Mr. Trudeau committed "all of the crimes" of which he was accused. The court indicated that it was bound to make such a finding by Second Circuit precedent addressing the application of acquitted conduct in sentencing, and by *United States v. Watts*, 519 U.S. 148. (Sent. Hearing at 27-28, 34-36 (A249, A251).) Inasmuch as the district court correctly interpreted this Court's prior holdings, this Court should reevaluate its acquitted conduct jurisprudence in light of recent Supreme Court cases.

### A. *Watts* **Is No Longer Good Law**

In rejecting prior challenges to the constitutionality of sentencing based on acquitted conduct, this Court – like other Circuits – has relied on *Watts*. *See, e.g., United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1582 (2013). *Watts* was dubious precedent from the outset, however, and its authority has only declined in the interim.

*Watts* was a *per curiam* decision – with two dissenters – that simultaneously granted certiorari, vacated, and remanded the case without full briefing or any oral

43

argument on the acquitted conduct issue. Foreshadowing later critiques, Justice Kennedy expressed his view that sentencing based on acquitted conduct raises concerns about undercutting the jury's verdict of acquittal. 519 U.S. at 170. (Kennedy, J., dissenting). The other dissenter, Justice Stevens, also pointed out that, under the Guidelines, the consideration of acquitted conduct means that a defendant's sentence can end up being the same whether most of the charges against him/her result in conviction or acquittal. *Id.* at 163. The practical upshot of this is that acquittals are, for all intents and purposes, simply erased.

In the 15 years since *Watts* was decided, the Supreme Court has issued a series of opinions emphasizing the importance of the jury's structural role in our constitutional system. *See supra*, pp. 29-30. At the same time, *Watts* has been roundly criticized by the bench, the bar, and legal scholars alike. *See, e.g., United States v. White*, 551 F.3d 381, 392-94 (6th Cir. 2008) (en banc) (Merritt, J., dissenting) (acquitted conduct sentencing "eviscerates the jury's longstanding power of mitigation"); *United States v. Canania,* 532 F.3d 764, 776 (8th Cir. 2007) (Bright, J., concurring) ("Permitting a judge to impose a sentence that reflects conduct the jury expressly disavowed through a finding of 'not guilty' amounts to more than mere second-guessing the jury – it entirely trivializes its principal fact-finding function."); *United States v. Grier*, 475 F.3d 556, 600 (3d Cir. 2007) (en banc) (McKee, J., dissenting) (acquitted conduct sentencing "represents a

44

regrettable erosion of a criminal defendant's constitutional right to due process");

*United States v. Mercado*, 474 F.3d 654, 658 (9th Cir. 2007) (Fletcher, J.,

dissenting) (similar); *United States v. Faust*, 456 F.3d 1342, 1350 (11th Cir. 2006)

(Barkett, J., concurring) ("[I]t 'perverts our system of justice to allow a defendant

to suffer punishment for a criminal charge for which he or she was acquitted.'"

(citation omitted) (alterations omitted)).

In *Booker*, the Supreme Court itself took pains to distance itself from *Watts*,

noting that:

> Watts, in particular, presented a very narrow question regarding the
> interaction of the Guidelines with the Double Jeopardy Clause, and did not
> even have the benefit of full briefing or oral argument. It is unsurprising
> that we failed to consider fully the issues presented to us . . . .

543 U.S. at 240 n.4. The Court also acknowledged that it had not yet addressed

whether the use of acquitted conduct in calculating the Guidelines range violates

the Sixth Amendment. *Id.* at 240.

Most recently, the Supreme Court's decision in *Alleyne* strongly suggests

that *Watts* was wrongly decided. In *Alleyne*, a jury convicted the defendant of

using or carrying a firearm during a crime of violence, but acquitted him of having

brandished the gun. As in the present case, however, the trial judge in *Alleyne*

ignored the jury verdict, finding, by a preponderance of the evidence, that he had

brandished. The Fourth Circuit affirmed. *Alleyne*, 133 S. Ct. at 2155-56. On

review, the Supreme Court held that the resulting increase in the mandatory

minimum sentence from five to seven years based on judicial fact-finding violated the Sixth Amendment right to a jury trial. *Id.* at 2163-64.

Beyond holding that the consideration of acquitted conduct was improper in the context of a mandatory minimum sentence, *Alleyne* provides two indications that the high court no longer considers *Watts* to be tenable. First, *Watts* relied heavily on the authority of *McMillan*, and specifically on the import *McMillan* placed on the distinction between offense elements and sentencing factors. As discussed above, *Alleyne* both explicitly overruled the holding of *McMillan* as to mandatory minimum sentences and put the final nail in the coffin of the notion that sentencing findings enjoy blanket immunity from Sixth Amendment protections.

Second, Justice Thomas's plurality opinion in *Alleyne* makes clear that the "touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense." *Id.* at 2158. Although the opinion does indicate that increasing the legal punishment is *sufficient* to render something an element of a crime, there is no suggestion that that is a *necessary* part of being an element. Rather, as every first year law student comes to learn, an element is simply a defining trait or essential ingredient:

> **Elements of crime:** The constituent parts of a crime — usu. consisting of the actus reus, mens rea, and causation — that the prosecution must prove to sustain a conviction. The term is more broadly defined by Model Penal Code § 1.13(9) to refer to each

> component of the actus reus, causation, the mens rea, any grading
> factors, and the negative of any defense.

Garner, Black's Law Dictionary, 2d. Pocket Ed., 231 (2001).  In other words,

every aspect of a crime that must be proven by the government is an element,

regardless of whether it alters the resulting punishment.  And every element is

subject to the jury right.  Crime and guilt are about more than just punishment; so

too are our basic freedoms from government abuse.

### B. Acquitted Conduct Sentencing Undermines the Rights to a Trial by Jury and Due Process of Law, and Violates the Sentencing Reform Act

### Acquitted conduct sentencing undermines the traditional role of the jury as a bulwark against abuse of governmental power

Enshrined in both the original Constitution and the Bill of Rights is a

guaranteed and absolute right to trial by jury.  *See* U.S. Const. Art. III, § 2, cl. 3;

U.S. Const. Amend. 6.  This absolute right was designed "to guard against a spirit

of oppression and tyranny on the part of rulers," and the Framers of the

Constitution intended the jury to serve as "the great bulwark of their civil and

political liberties."  *United States v. Gaudin*, 515 U.S. 506, 510-11 (1995).  Early

juries exercised their "power to thwart Parliament and [the] Crown," whether by

acquitting in the face of guilt or by handing down "what today we would call

verdicts of guilty to lesser included offenses, manifestations of what Blackstone

described as 'pious perjury' on the jurors' part."  *Jones*, 526 U.S. at 245 (citation

omitted). "That this history had to be in the minds of the [Constitution's] Framers is beyond cavil." *Id.* at 247.

The Framers could not have intended to erect the "great bulwark" of the criminal jury, empowered to confirm or reject the truth of every accusation, and indeed to acquit even in the face of guilt or to guard against unduly harsh punishment, only to yield that very power to a probation officer, a prosecutor, and a judge capable of nullifying the jury's verdict. Doing so would render the right to a criminal jury a mere procedural formality, eviscerating this "fundamental reservation of power in our constitutional structure." *Blakely*, 542 U.S. at 305-306. The jury's function was never intended to be so minor as simply rendering "a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish." *Id.* at 306-307. Rather, "the judge's authority to sentence derives wholly from the jury's verdict." *Id.* at 306.

### Acquitted conduct sentencing undermines public confidence in the legal system

Furthermore, a sentence based on acquitted conduct enhancements undermines the firmly established public expectation that offenders are punished only for crimes of which they are convicted, and not for charges on which they are acquitted. Indeed, the very idea that a defendant can be acquitted of serious charges against him and still be punished just as if the jury had returned a

48

conviction on those counts offends prevailing notions of fairness and undermines confidence in the justice system. *See, e.g., United States v. Lombard*, 102 F.3d 1, 5 (1st Cir. 1996) (acknowledging that "as a matter of public perception and acceptance, [the use of acquitted conduct sentencing] can often invite disrespect for the sentencing process"); *United States v. Coleman*, 370 F. Supp. 2d 661, 671-73, n.14 (S.D. Ohio 2005) (noting that "consideration of acquitted conduct has a deleterious effect on the public's view of the criminal justice system [because a] layperson would undoubtedly be revolted by the idea"); *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006) (Posner, J.) (similar); *see also United States v. Frias*, 39 F.3d 391, 393 (2d Cir. 1994) (Oakes, J., concurring) (acquitted conduct sentencing is a "jurisprudence reminiscent of Alice in Wonderland. As the Queen of Hearts might say, 'Acquittal first, sentence afterwards'").

Where the operation of the Sentencing Guidelines treats acquitted conduct exactly the same as convicted conduct, acquittals are rendered, in essence, legally meaningless. The unavoidable result is to cast doubt on the right to a fair trial, and to devalue the historic and esteemed role of juries in the American legal system. As Judge Newman has observed, a "just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal.") *United States v. Concepcion*, 983

F.2d 369, 396 (2d Cir. 1992) (Newman, J., dissenting from denial of request for

rehearing en banc).

## Acquitted conduct sentencing undermines
## other core constitutional protections

A final set of critiques leveled against acquitted conduct sentencing is that

the practice can facilitate, exacerbate, and even motivate an end-run around various

other constitutional protections. As Judge Bright explained in his *Canania*

concurrence:

> Before the jury, the Government must prove its case beyond a
> reasonable doubt. But if it loses on some counts, that matters little.
> Free of the Federal Rules of Evidence, most constitutionally-imposed
> procedures, and the burden of proving any critical facts beyond a
> reasonable doubt, the Government gets the proverbial "second bite at
> the apple" during sentencing to essentially retry those counts on which
> it lost.

*Canania*, 532 F.3d at 776-78 (Bright, J., concurring). So long as the government

has sufficient admissible evidence to convince the jury to convict on a single count

– the "hook" – it will have the opportunity to show the trial judge everything from

hearsay to evidence of prior convictions to the fruits of illegal searches in the hope

of convincing *the court* that the defendant is, more likely than not, guilty of other

crimes as well. *See Mercado*, 474 F.3d at 660 (Fletcher, J., dissenting) ("Absent

these protections, the government and its officials could circumvent the jury,

presenting alleged key facts directly to the judge, thus attenuating the connection

between verdict and punishment."); *Grier, supra,* 475 F.3d at 574 (Ambro, J.,

concurring) ("In effect, we have a shadow criminal code under which, for certain suspected offenses, a defendant receives few of the trial protections mandated by the Constitution.").

This trial within a trial denigrates the role of the jury, which becomes little more than a mule the prosecution must ride across the river of trial and onto the far bank of sentencing. It makes a mockery of both constitutional and evidentiary protections, incentivizing prosecutors to bring charges that will be difficult if not impossible to prove beyond a reasonable doubt. *See* Mark Hansen, Acquitting Time After Apprendi, New Challenges to Sentencing Enhancements Emerge, ABA J. 18, 20 (August 2008); Matthew MacKinnon Shors, United States v. Watts: Unanswered Questions, Acquittal Enhancements, and the Future of Due Process and the American Criminal Jury, 50 Stan. L. Rev. 1349, 1386-87 (1998). And it places criminal defendants in the unreasonable and unjust position of having to make untenable strategic decisions about whether to try the case for the jury or the judge. As Judge Barkett explained in his *Faust* concurrence:

> The sentencing practice that Faust challenges does more than offer the government a second, if smaller, bite at the apple in criminal prosecutions. And it does more, even, than undermine the "particular significance" that law and society attach to an acquittal. . . . When one looks to "the practicalities of the criminal justice system," it becomes apparent that the most pernicious effect of sentencing on the basis of acquitted conduct, and the one that most insidiously "violates those fundamental conceptions of justice which . . . define the community's sense of fair play and decency . . .," is its implicit and often hopeless demand that, in order to avoid punishment for charged

conduct, criminal defendants must prove their innocence under two drastically different standards at once. . . . Calling on a defendant to convince a jury of his innocence beyond a reasonable doubt, even as he must constantly account for the court's ability to sentence him under a preponderance standard, exacerbates the very disparities which the reasonable doubt standard has been employed to correct.

*United States v. Faust*, 456 F.3d at 1353 (Barkett, J., concurring) (citations omitted).

In light of *Alleyne*'s powerful affirmation of the historical and continued importance of the jury as a "guard against a spirit of oppression and tyranny"; 133 S. Ct. at 2161 (Thomas, J., plurality opinion); this Court should hold that the use of acquitted conduct in sentencing violates the Fifth and Sixth Amendments.

Here, the district court brushed aside the jury's seven acquittals in a single declaration: "The Court finds by a preponderance of the evidence that the various other acts of Mr. Trudeau as alleged in the indictment as well as covered in some respects in the Presentence Report, *were* committed by him." (Emphasis added) (Sent. Hearing at 31 (A250).) This is precisely the type of judicial nullification that the Founders feared and sought to protect against in erecting the absolute right to trial by jury.

## VI.   REMEDY

### A.   Scope of Remand

If the Court concludes that the sentence imposed based on acquitted conduct and judicial fact-finding was disproportionate to the one that flowed directly from

the jury verdict, the Court should remand with instructions that the trial court depart downward to a more appropriate offense level. By contrast, if the Court concludes that (1) consideration of acquitted conduct was improper or (2) any objects of the Count 1 conspiracy other than the Agah loan must be found by a jury, the case should be remanded for resentencing with instructions that losses resulting from and Mr. Trudeau's alleged role in the substantive crimes alleged in Counts 2 - 8 not be taken into account.

As discussed in Section I *supra*, a similar result is dictated even if the Court concludes that the objects of the Count One conspiracy may be found by a judge beyond a reasonable doubt, because in this case the jury verdict precludes such a finding. A jury has already concluded that there is insufficient evidence to find, beyond a reasonable doubt, that Mr. Trudeau engaged in, solicited, assisted, or counseled any of the substantive crimes alleged aside from Count 9, and it has necessarily rejected the credibility of witnesses who testified to the contrary.

In *United States v. Kramer*, 289 F.2d 909 (2d Cir. 1961), the government provided detailed evidence of the alleged substantive crimes, and the jury was charged as to aiding and abetting liability. Reflecting on the verdict of acquittal, this Court said:

> There can hardly be mystery as to what was determined by the verdict of "not guilty," general though it was. . . . The verdict of the Connecticut jury thus settled that Kramer did not burglarize the

53

Wilton and Orange post offices on the nights of May 26 and June 14 *and was not responsible for whoever did.*

*Id.* at 914 (emphasis added). Moreover, because the government had alleged that

Kramer was a leader and active participant in the crimes, and had tried him

accordingly, this Court did not permit a subsequent prosecution on a theory of pure

conspiracy:

> [A]lthough, in theory, acquittal of the substantive charges of burglary, which demanded proof the criminal acts were done, is not inconsistent with a conviction of conspiracy to burglarize, which demands only proof of an agreement and a single overt act, "the core of the prosecutor's case was in each [c]ase the same." The evidence to prove the conspiracy to burglarize, if believed, showed that Kramer was not just a person who agreed the burglaries should be committed; even the portion of the testimony that related only to conversations showed Kramer to be one who "counsels, commands, induces or procures" the criminal acts, 18 U.S.C. 2,— indeed, on that testimony, Kramer was one of the principal guiding forces. Yet this is exactly what the Connecticut judgment precludes the Government from seeking to prove.

*Id.* at 919; *see also United States v. Mespoulede*, 597 F.2d 329, 333-34 (2d

Cir.1979) (similar). The reasoning of *Kramer* applies with equal force here. The

record in this case simply will not support any finding, beyond a reasonable doubt,

that Mr. Trudeau conspired to commit the offenses alleged in Counts 2 - 8.

## B.    Remand to a Different Judge

On remand, the case should be assigned to a different district judge for

resentencing. In evaluating whether remand to a new judge is warranted, this

Court considers any evidence of personal bias and, in the alternative, the three

factor test identified in *United States v. Robin*, 553 F.2d 8 (2d Cir. 1977):

> (1) whether the original judge would reasonably be expected upon
> remand to have substantial difficulty in putting out of his or her mind
> previously-expressed views or findings determined to be erroneous or
> based on evidence that must be rejected, (2) whether reassignment is
> advisable to preserve the appearance of justice, and (3) whether
> reassignment would entail waste and duplication out of proportion to
> any gain in preserving the appearance of fairness.

*Id.* at 10. This Court has found that the appearance of justice would be fostered by

remand to a new judge where, for example, the original judge rejected without

justification a magistrate judge's findings that the defendant's testimony was

credible. *Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999). In *Cullen*, the

Court concluded that the defendant and even outside observers might reasonably

wonder whether the original judge would permit his initial ruling to influence his

second determination during resentencing. *Id.* at 408. Reassignment is

particularly favored where the original judge served in a fact-finding role, was

exposed to inadmissible evidence, and will be asked to make similar findings of

fact on remand under a different legal standard. *See Robin*, 553 F.2d at 10.

Those factors point strongly in the direction of assigning a new judge in the

present case. Mr. Trudeau's sentence was largely the result of improper judicial

fact-finding. Judge Hall made it clear that she relied on evidence that the

government was not able to put before the jury, evidence that would be at the

forefront of her thoughts during resentencing. (Sent. Hearing at 56-57 (A256-57).) And there was at least the appearance that she increased Mr. Trudeau's criminal history level based on her disapproval of legitimate legal positions taken and arguments made by defense counsel. (*Id.* at 107, 116-17, 125-26 (A269, A271-72, A274).) Under those circumstances, as in *Cullen*, the appearance of fairness and impartiality would best be served by allowing a new judge to sentence according to the proper legal standard.

## CONCLUSION

For these reasons, this Court should hold that the manner in which Mr. Trudeau was sentenced violated the Federal Sentencing Guidelines, his Fifth Amendment right to due process of law, his Sixth Amendment right to trial by jury, and 18 U.S.C. § 3553(a). The case should be remanded for resentencing by a different district judge.

Dated: August 9, 2013          Respectfully submitted,

/s/ Paul S. Bailin
Ross H. Garber
Paul S. Bailin
Michael G. Chase
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103
Telephone:  (860) 251-5011
Facsimile:  (860) 251-5319
Email:  pbailin@goodwin.com

And

James K. Filan
Filan LLC
315 Post Road West
Westport, CT 06880
Tel: (203) 557-9159
Fax: (203) 341-8560

Counsel for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to F.R.A.P. 32(a)(7)(C), the undersigned hereby certifies that the foregoing brief complies with the applicable type-volume limitation of F.R.A.P. 32(a)(7)(B) in that it contains 13,977 words, including headings, footnotes and quotations, but excluding cover page, table of contents, table of authorities, and attorney certificates. In making this certification, I have relied on the word count function of Microsoft Word, the word-processing system used to prepare this brief.

The undersigned also certifies that the foregoing brief complies with the typeface requirements of F.R.A.P. 32(a)(5)(A) in that the brief has been prepared in a proportionally spaced typeface, 14 point, using Microsoft Word Version 2010, and complies with F.R.A.P. 32(a)(6) in that the brief has been prepared in Times New Roman style.

/s/ Paul S. Bailin
Paul S. Bailin
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5011
Facsimile: (860) 251-5319
Email: pbailin@goodwin.com

# SPECIAL APPENDIX

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

### U.S. Const. Art. III, § 2, cl. 3

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

### U.S. Const. Amend. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### U.S. Const. Amend. VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

### 18 U.S.C.A. § 3553

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

\* \* \*

**2012 U.S. Sentencing Commission Federal Sentencing Guidelines**

## §1B1.1. Application Instructions

(a) The court shall determine the kinds of sentence and the guideline range as set forth in the guidelines (see 18 U.S.C. § 3553(a)(4)) by applying the provisions of this manual in the following order, except as specifically directed:

(1) Determine, pursuant to §1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction. See §1B1.2.

(2) Determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed.

(3) Apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three.

(4) If there are multiple counts of conviction, repeat steps (1) through (3) for each count. Apply Part D of Chapter Three to group the various counts and adjust the offense level accordingly.

(5) Apply the adjustment as appropriate for the defendant's acceptance of responsibility from Part E of Chapter Three.

(6) Determine the defendant's criminal history category as specified in Part A of Chapter Four. Determine from Part B of Chapter Four any other applicable adjustments.

(7) Determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category determined above.

(8) For the particular guideline range, determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution.

(b) The court shall then consider Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence. See 18 U.S.C. § 3553(a)(5).

(c) The court shall then consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole. See 18 U.S.C. § 3553(a).

## §1B1.1 App. Note 5

Where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision

that results in the greater offense level. E.g., in §2A2.2(b)(2), if a firearm is both discharged and brandished, the provision applicable to the discharge of the firearm would be used.

## §1B1.2. Applicable Guidelines

(a) Determine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted). However, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two applicable to the stipulated offense.
Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction. If the offense involved a conspiracy, attempt, or solicitation, refer to §2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense. For statutory provisions not listed in the Statutory Index, use the most analogous guideline. See §2X5.1 (Other Offenses). The guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction. See §1B1.9 (Class B or C Misdemeanors and Infractions).
(b) After determining the appropriate offense guideline section pursuant to subsection
(a) of this section, determine the applicable guideline range in accordance with §1B1.3 (Relevant Conduct).

* * *

(d) A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

## §1B1.2, App. Notes

* * *

3. Subsections (c) and (d) address circumstances in which the provisions of Chapter Three, Part D (Multiple Counts) are to be applied although there may be only one count of conviction. Subsection (c) provides that in the case of a stipulation to the commission of additional offense(s), the guidelines are to be applied as if the defendant had been convicted of an additional count for each of the offenses stipulated. For example, if the defendant is convicted of one count of robbery but, as part of a plea agreement, admits to having committed two

additional robberies, the guidelines are to be applied as if the defendant had been convicted of three counts of robbery. Subsection (d) provides that a conviction on a conspiracy count charging conspiracy to commit more than one offense is treated as if the defendant had been convicted of a separate conspiracy count for each offense that he conspired to commit. For example, where a conviction on a single count of conspiracy establishes that the defendant conspired to commit three robberies, the guidelines are to be applied as if the defendant had been convicted on one count of conspiracy to commit the first robbery, one count of conspiracy to commit the second robbery, and one count of conspiracy to commit the third robbery.

4. Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under §3D1.2(d) (e.g., a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because §1B1.3(a)(2) governs consideration of the defendant's conduct.

## §1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)

(a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
(1)
(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
(2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in

subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
(4) any other information specified in the applicable guideline.

## §1B1.3 App. Note 2

\* \* \*

Illustrations of Conduct for Which the Defendant is Accountable

(a) Acts and omissions aided or abetted by the defendant
(1) Defendant A is one of ten persons hired by Defendant B to off-load a ship containing marihuana. The off-loading of the ship is interrupted by law enforcement officers and one ton of marihuana is seized (the amount on the ship as well as the amount off-loaded). Defendant A and the other off-loaders are arrested and convicted of importation of marihuana. Regardless of the number of bales he personally unloaded, Defendant A is accountable for the entire one-ton quantity of marihuana. Defendant A aided and abetted the off-loading of the entire shipment of marihuana by directly participating in the off-loading of that shipment (i.e., the specific objective of the criminal activity he joined was the off-loading of the entire shipment). Therefore, he is accountable for the entire shipment under subsection (a)(1)(A) without regard to the issue of reasonable foreseeability. This is conceptually similar to the case of a defendant who transports a suitcase knowing that it contains a controlled substance and, therefore, is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance. In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. As noted in the preceding paragraph, Defendant A is accountable for the entire one-ton shipment of marihuana under subsection (a)(1)(A). Defendant A also is accountable for the entire one-ton shipment of marihuana on the basis of subsection (a)(1)(B)(applying to a jointly undertaken criminal activity). Defendant A engaged in a jointly undertaken criminal activity (the scope of which was the importation of the shipment of marihuana). A finding that the one-ton quantity of marihuana was reasonably foreseeable is warranted from the nature of the undertaking itself (the importation of marihuana by ship typically involves very large quantities of marihuana). The specific circumstances of the case (the defendant was one of ten persons offloading the marihuana in bales) also support this finding. In an actual case, of course, if a defendant's

accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established.

\* \* \*

(c) Requirement that the conduct of others be in furtherance of the jointly undertaken criminal activity and reasonably foreseeable; scope of the criminal activity

\* \* \*

(2) Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the entire amount ($55,000). Each defendant is accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.

\* \* \*

(4) Defendant K is a wholesale distributor of child pornography. Defendant L is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K. Similarly, Defendant M is a retail-level dealer who purchases child pornography from Defendant K and resells it, but otherwise operates independently of Defendant K. Defendants L and M are aware of each other's criminal activity but operate independently. Defendant N is Defendant K's assistant who recruits customers for Defendant K and frequently supervises the deliveries to Defendant K's customers. Each defendant is convicted of a count charging conspiracy to distribute child pornography. Defendant K is accountable under subsection (a)(1)(A) for the entire quantity of child pornography sold to Defendants L and M. Defendant N also is accountable for the entire quantity sold to those defendants under subsection (a)(1)(B) because the entire quantity was within the scope of his jointly undertaken criminal activity and reasonably foreseeable. Defendant L is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K because the scope of his jointly undertaken criminal activity is limited to that amount. For the same reason, Defendant M is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K.

\* \* \*

(6) Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another streetlevel drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

\* \* \*

(8) Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana (subsection (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity. In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported (subsection (a)(1)(A)). As this example illustrates, in cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.

**§2B1.1. Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States**

(a) Base Offense Level:
(1) 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or
(2) 6, otherwise.
(b) Specific Offense Characteristics
(1) If the loss exceeded $5,000, increase the offense level as follows:
Loss (Apply the Greatest) Increase in Level
(A) $5,000 or less no increase
(B) More than $5,000 add 2
(C) More than $10,000 add 4
(D) More than $30,000 add 6
(E) More than $70,000 add 8
(F) More than $120,000 add 10
(G) More than $200,000 add 12
(H) More than $400,000 add 14
(I) More than $1,000,000 add 16
(J) More than $2,500,000 add 18

\* \* \*

(2) (Apply the greatest) If the offense—
(A) (i) involved 10 or more victims; or (ii) was committed through massmarketing, increase by 2 levels;

\* \* \*

(15) (Apply the greater) If—

(A) the defendant derived more than $1,000,000 in gross receipts from one

or more financial institutions as a result of the offense, increase by 2

levels; or

\* \* \*

(D) If the resulting offense level determined under subdivision (A) or (B)

67

is less than level 24, increase to level 24.

\* \* \*

## §3A1.1. Hate Crime Motivation or Vulnerable Victim

(a) If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels.

\* \* \*

## §3B1.1. Aggravating Role

Based on the defendant's role in the offense, increase the offense level as follows:
(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

\* \* \*

## §3D1.1. Procedure for Determining Offense Level on Multiple Counts

(a) When a defendant has been convicted of more than one count, the court shall:
(1) Group the counts resulting in conviction into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in §3D1.2.
(2) Determine the offense level applicable to each Group by applying the rules specified in §3D1.3.
(3) Determine the combined offense level applicable to all Groups taken together by applying the rules specified in §3D1.4.

\* \* \*

## §3D1.2. Groups of Closely Related Counts

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
(a) When counts involve the same victim and the same act or transaction.
(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
(c) When one of the counts embodies conduct that is treated as a specific offense

characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are to be grouped under this subsection:

§2A3.5;
§§2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
§§2C1.1, 2C1.2, 2C1.8;
§§2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
§§2E4.1, 2E5.1;
§§2G2.2, 2G3.1;
§2K2.1;
§§2L1.1, 2L2.1;
§2N3.1;
§2Q2.1;
§2R1.1;
§§2S1.1, 2S1.3;
§§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.

Specifically excluded from the operation of this subsection are:
all offenses in Chapter Two, Part A (except §2A3.5);

§§2B2.1, 2B2.3, 2B3.1, 2B3.2, 2B3.3;
§2C1.5;
§§2D2.1, 2D2.2, 2D2.3;
§§2E1.3, 2E1.4, 2E2.1;
§§2G1.1, 2G2.1;
§§2H1.1, 2H2.1, 2H4.1;
§§2L2.2, 2L2.5;
§§2M2.1, 2M2.3, 2M3.1, 2M3.2, 2M3.3, 2M3.4, 2M3.5, 2M3.9;
§§2P1.1, 2P1.2, 2P1.3;
§2X6.1.

For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based

upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level. Exclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection.

* * *

## §5A. Sentencing Table

## SENTENCING TABLE
### (in months of imprisonment)

| Offense Level | Criminal History Category (Criminal History Points) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| **Zone A** 1 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 |
| 2 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 1-7 |
| 3 | 0-6 | 0-6 | 0-6 | 0-6 | 2-8 | 3-9 |
| 4 | 0-6 | 0-6 | 0-6 | 2-8 | 4-10 | 6-12 |
| 5 | 0-6 | 0-6 | 1-7 | 4-10 | 6-12 | 9-15 |
| 6 | 0-6 | 1-7 | 2-8 | 6-12 | 9-15 | 12-18 |
| **Zone B** 7 | 0-6 | 2-8 | 4-10 | 8-14 | 12-18 | 15-21 |
| 8 | 0-6 | 4-10 | 6-12 | 10-16 | 15-21 | 18-24 |
| 9 | 4-10 | 6-12 | 8-14 | 12-18 | 18-24 | 21-27 |
| 10 | 6-12 | 8-14 | 10-16 | 15-21 | 21-27 | 24-30 |
| 11 | 8-14 | 10-16 | 12-18 | 18-24 | 24-30 | 27-33 |
| **Zone C** 12 | 10-16 | 12-18 | 15-21 | 21-27 | 27-33 | 30-37 |
| 13 | 12-18 | 15-21 | 18-24 | 24-30 | 30-37 | 33-41 |
| 14 | 15-21 | 18-24 | 21-27 | 27-33 | 33-41 | 37-46 |
| 15 | 18-24 | 21-27 | 24-30 | 30-37 | 37-46 | 41-51 |
| 16 | 21-27 | 24-30 | 27-33 | 33-41 | 41-51 | 46-57 |
| 17 | 24-30 | 27-33 | 30-37 | 37-46 | 46-57 | 51-63 |
| 18 | 27-33 | 30-37 | 33-41 | 41-51 | 51-63 | 57-71 |
| 19 | 30-37 | 33-41 | 37-46 | 46-57 | 57-71 | 63-78 |
| 20 | 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |
| 21 | 37-46 | 41-51 | 46-57 | 57-71 | 70-87 | 77-96 |
| 22 | 41-51 | 46-57 | 51-63 | 63-78 | 77-96 | 84-105 |
| 23 | 46-57 | 51-63 | 57-71 | 70-87 | 84-105 | 92-115 |
| 24 | 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |
| 25 | 57-71 | 63-78 | 70-87 | 84-105 | 100-125 | 110-137 |
| 26 | 63-78 | 70-87 | 78-97 | 92-115 | 110-137 | 120-150 |
| **Zone D** 27 | 70-87 | 78-97 | 87-108 | 100-125 | 120-150 | 130-162 |
| 28 | 78-97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |
| 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| 43 | life | life | life | life | life | life |

71

AO245b (USDC-CT Rev. 9/07)

UNITED STATES DISTRICT COURT

Page 1                                                    District of Connecticut

UNITED STATES OF AMERICA                    **JUDGMENT IN A CRIMINAL CASE**

v.                                    CASE NO. *3:10cr234 (JCH)*
                                                   USM NO: *14136-014*
William A. Trudeau, Jr.

                                                   *Rahul Kale*
                                                   Assistant United States Attorney

                                                   *James Filan*
                                                   Defendant's Attorney


**THE DEFENDANT:**  was found guilty on counts 1, 9 of the Indictment.


Accordingly the defendant is adjudicated guilty of the following offenses:


| Title & Section | Nature of Offense | Offense Concluded | Counts |
|---|---|---|---|
| 18 U.S.C. section 1349 | Conspiracy to Commit Bank Fraud, Mail Fraud and Wire Fraud | April 13, 2010 | 1 |
| 18 U.S.C. section 1343 | Wire Fraud | April 13, 2010 | 9 |


The following sentence is imposed pursuant to the Sentencing Reform Act of 1984. The Court first departed upwards under 4A1.3, based in inadequacy of criminal history category to a category V, resulting in a sentencing range of 210 to 262 months imprisonment. The Court then imposed a non-guideline sentence which reflects the understatement of defendant's criminal history, the seriousness of the offense, the defendant's pretrial conduct and the nature of his prior convictions. The sentence is sufficient, but not greater than necessary under 18 U.S.C. 3553(a) to provide adequate deterrence and protect the public.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 188 months on Count 1, and a term of 188 months on Count 9 of the Indictment, all to run concurrently, for a total term of imprisonment of 188 months.

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a total term of 5 years on count 1 and 5 years on count 9, all to run concurrently, for a total term of 5 years of supervised release. The Mandatory and Standard Conditions of Supervised Release as attached, are imposed. In addition, the following Special Conditions are imposed:
    1.  The defendant shall avoid all contact with any victim in the subject offenses of conviction.
    2.  The defendant shall pay any restitution that is imposed by this judgment, payable immediately, at a rate of no less than $500.00 per month. The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the Probation Office and approved by the court.
    3.  The defendant shall not incur new credit charges above $250.00 or open additional lines of credit without the prior permission of the Probation Office until the defendant's criminal debt obligation is paid. The defendant shall not add any new names to any lines of credit, shall not be added as a secondary card holder on another's line of credit and shall provide the Probation Office with electronic access to any online management of any lines of credit, including lines of credit for businesses/LLC's that are owned, operated or otherwise associated with the defendant.

72

Page 2

    4.   Upon commencement of supervised release the defendant shall close all other savings/checking accounts, transfer all assets into one main bank account and shall not add any new account holders to that account (the account may include the defendant's spouse if there are joint marital assets/expenses). The defendant shall provide the Probation Office with electronic "read only" access to any online management of the account. The defendant shall provide the final statement from each account that is closed to ensure that no funds are dissipated during the closing of existing accounts and opening of existing accounts and opening of the single account. All transactions will be undertaken through the single account.

    5.   The defendant shall permit the Probation Office to monitor investment and retirement accounts to include coordinating with the account administrator to notify the Probation Office of any activity on the account.

    6.   The defendant shall not encumber personal homes or investment properties without permission of the court and shall not transfer, sell, give away, barter, or dissipate in any way any assets, including personal property (ie: motor vehicles, recreational vehicles ) without the express permission of the Probation Office and notification to the court.

    7.   Upon request, the defendant shall submit a proposed budget (detailing expected income and expenses) to the Probation Office, after which the Probation Office shall communicate its approval to the defendant. The defendant shall adhere to the approved budget and any deviations must be approved before incurring and paying the expense. Any receipt of income or asset not anticipated by the approved budget shall be reported to the Probation Office within two days of the receipt of the income or asset, or within two days of the defendant's receipt of knowledge that such income or asset will be received, whichever comes sooner. Such unanticipated income or asset can not be dissipated without prior permission of the Probation Office.

    8.   The defendant shall retain receipts for inspection, upon reasonable notice, any expenditures greater than $250.00.

    9.   The defendant shall not possess ammunition, a firearm or other dangerous weapon.

    10.   As directed by the Probation Office, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the Probation Office to make such notifications and to confirm the defendant's compliance with such notification requirement.

    11.   The defendant shall file timely tax returns and provide copies to the Probation Office within 15 days of filing.

**CRIMINAL MONETARY PENALTIES**

The defendant must pay the total criminal monetary penalties under the schedule of payments (as follows) or (as noted on the restitution order).

| | | |
|---|---|---|
| **Special Assessment:** | $200.00 | $100.00 on each of counts 1 and 9, to be paid immediately. |
| **Restitution:** | $4,260,008.40 | Order of Restitution will issue. |

It is further ordered that the defendant will notify the United States Attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs and special assessments imposed by this judgment, are paid.

Page 3

## JUDICIAL RECOMMENDATION(S) TO THE BUREAU OF PRISONS

The defendant shall be designated by the Bureau of Prisons to one of the following facilities in the following order of preference: (1) Fort Devens, a facility in Massachusetts, (2) Otisville, a facility in New York, (3) Fort Dix, a facility in New Jersey, or (4) an appropriate facility closest to Newtown, Connecticut.

**The defendant is remanded to the custody of the United States Marshal.**

<u>2/12/2013</u>
Date of Imposition of Sentence

<u>/s/Janet C. Hall</u>
Janet C. Hall
United States District Judge
Date: 2/15/2013

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.

_____
Joseph P. Faughnan
United States Marshal

By _____
Deputy Marshal

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE _____*
*ROBERTA D. TABORA, Clerk*
*BY: _____*
    *Deputy Clerk*

74

AO245b (USPC)Case 3.13-cr-00234-JCH Document 200 Filed 02/15/13 Page 4 of 86
Case 3:10-cr-00234-JCH Document 200 Filed 02/15/13 Page 4 of 4
Page 4

# CONDITIONS OF SUPERVISED RELEASE

In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:

## MANDATORY CONDITIONS

■ (1)   The defendant shall not commit another federal, state or local offense;

■ (2)   The defendant shall not unlawfully possess a controlled substance;

☐ (3)   The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. section 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is available within a 50-mile radius of the legal residence of the defendant;

☐ (4)   The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter for use of a controlled substance;

☐ (5)   If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay that fine;

■ (6)   The defendant shall (A) make restitution in accordance with 18 U.S.C. sections 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. section 3013;

☐ (7)   (A)   In a state in which the requirements of the Sex Offender Registration and Notification Act (see 42 U.S.C. §§ 16911 and 16913) do not apply, a defendant convicted of a sexual offense as described in 18 U.S.C. § 4042(c)(4) (Pub. L. 105-119, § 115(a)(8), Nov. 26, 1997) shall report the address where the defendant will reside and any subsequent change of residence to the probation officer responsible for supervision, and shall register as a sex offender in any State where the person resides, is employed, carries on a vocation, or is a student; or

          (B)   In a state in which the requirements of Sex Offender Registration and Notification Act apply, a sex offender shall (i) register, and keep such registration current, where the offender resides, where the offender is an employee, and where the offender is a student, and for the initial registration, a sex offender also shall register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence; (ii) provide information required by 42 U.S.C. § 16914; and (iii) keep such registration current for the full registration period as set forth in 42 U.S.C. § 16915;

■ (8)   The defendant shall cooperate in the collection of a DNA sample from the defendant.

While on supervised release, the defendant shall also comply with all of the following Standard Conditions:

## STANDARD CONDITIONS

(1)   The defendant shall not leave the judicial district or other specified geographic area without the permission of the court or probation officer;

(2)   The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

(3)   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

(4)   The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant for the support and maintenance of any child or of a child and the parent with whom the child is living);

(5)   The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

(6)   The defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within five days after such change;

(7)   The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician;

(8)   The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered, or other places specified by the court;

(9)   The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

(10)   The defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

(11)   The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

(12)   The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

(13)   The defendant shall pay the special assessment imposed or adhere to a court-ordered installment schedule for the payment of the special assessment;

(14)   The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.

**The defendant shall report to the Probation Office in the district to which the defendant is released within 72 hours of release from the custody of the U.S. Bureau of Prisons. Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.**

**These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.**

(Signed) _____      _____
             **Defendant**                      **Date**

        _____      _____
        **U.S. Probation Officer/Designated Witness**      **Date**

AO 245A (Rev 12/03) Judgment of Acquittal

# UNITED STATES DISTRICT COURT

_____ DISTRICT OF _____ CONNECTICUT

UNITED STATES OF AMERICA

v.

William A. Trudeau, Jr.

## JUDGMENT OF ACQUITTAL

CASE NUMBER: 3:10cr234 (JCH)

The defendant was found not guilty on counts 2,3,4,5,6,7 and 8 of the Indictment.  IT IS ORDERED that the defendant is acquitted as to counts 2,3,4,5,6,7 and 8 of the Indictment.

United States District Court
District of Connecticut
FILED AT NEW HAVEN

2 | 15 2013

By _____

/s/ Janet C. Hall
_____
Signature of Judge

Janet C. Hall          U.S. District Judge
_____        _____
Name of Judge          Title of Judge

Feb. 15 2013
_____
Date

## CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of August, 2013, a copy of the foregoing was filed electronically via operation of the Court's CM/ECF Electronic Filing System. A Notice of Electronic Filing will be sent by e-mail to all parties via operation of the Court's CM/ECF Electronic Filing System or by mail to anyone unable to accept electronic filing as indicated on the Notice. Parties may access this filing through the Court's CM/ECF System.

Sandra Slack Glover, Assistant United States Attorney
United States Attorney's Office, District of Connecticut
23rd Floor
157 Church Street
New Haven, CT 06510
Tel: 203-821-3700

Rahul Kale, Assistant U.S. Attorney
United States Attorney's Office, District of Connecticut
Suite 309
1000 Lafayette Boulevard
Bridgeport, CT 06604
Tel: 203-696-3023

/s/ Paul S. Bailin
Paul S. Bailin

2923012v1